# In The Matter Of:
## J.K.J. / M.J.J. v.
## Polk County Sheriff's Department, et al.

## Deposition of Darryl L. Christensen
## May 18, 2016



Excellence In Court Reporting

**EXHIBIT 2**

*Original File Christensen Darryl 5-18-16.txt*
*Min-U-Script® with Word Index*

**Page 5**

```
 1         A P P E A R A N C E S  (Continued)
 2
     MARTIN J. DE VRIES, Attorney,
 3     for SAGER & COLWIN LAW OFFICES, S.C.,
         Attorneys at Law, 201 South Marr Street,
 4       Fond du Lac, Wisconsin 54935, appearing on
         behalf of Defendant Darryl L. Christensen.
 5
 6   LORI M. LUBINSKY, Attorney,
       for AXLEY BRYNELSON, LLP, Attorneys at Law,
 7       Two East Mifflin Street, Suite 200, Madison,
         Wisconsin 53703, appearing on behalf of the
 8       Intervenor.
 9
10   _____
11
12           DARRYL L. CHRISTENSEN,
13       called as a witness, being first duly sworn,
14       testified on oath as follows:
15
16              EXAMINATION
17   By Ms. Lubinsky:
18   Q   State your full name, please.
19   A   Darryl Lynn Christensen.
20   Q   What's the spelling of your middle name?
21   A   L-y-n-n.
22   Q   Very good.  And, Mr. Christensen, what is your
23       date of birth?
24   A   5/26/66.
25   Q   And you understand that you are named in a lawsuit
```

**Page 6**

```
 1       that is the reason why we're here today?
 2   A   Yes.
 3   Q   I want to take you back and talk to you a little
 4       bit about your employment with Polk County, okay?
 5   A   Okay.
 6             (Exhibit No. 1 marked for
 7              identification)
 8   Q   All right.  Sir, I'm showing you what's been
 9       marked as Exhibit 1.  I'll represent to you this
10       is a copy of a position description for the
11       Corrections Officer position, at least that has a
12       revised date, as you'll see at the top, of
13       February 17, 2011.
14   A   Okay.
15   Q   First of all, do you see that?
16   A   Yes.
17   Q   All right.  Were you employed as a corrections
18       officer for Polk County?
19   A   Yes.
20   Q   Do you recall approximately when you first began
21       such employment?
22   A   Yes.  July 30, 1995.
23   Q   I saw in your personnel file that there appeared
24       to be a point where you became -- that there was a
25       promotion of some sort --
```

**Page 7**

```
 1   A   Yes.
 2   Q   -- and then you resigned from that position.
 3   A   Yes.
 4   Q   Just tell me a little bit about that.
 5   A   I was promoted to jail sergeant.  I remember it
 6       was 2000, 2001, somewhere around in there.
 7   Q   And then did you resign from that position?
 8   A   Yes.  I held the position for a little over
 9       two years, I believe, and stepped back down to be
10       a senior jail officer.
11   Q   Is there a difference between a senior jail
12       officer and a corrections officer?
13   A   No.
14   Q   Okay.
15   A   No.
16   Q   So if I can summarize your employment, from '95
17       through the end date, which we'll talk about in a
18       minute, you were a corrections officer, other than
19       those approximate two years when you were a jail
20       sergeant?
21   A   Correct.
22   Q   Very good.  Can you just take a look at Exhibit 1.
23   A   Sure.
24   Q   And tell me whether it, to the best of your
25       memory, accurately summarizes your job
```

**Page 8**

```
 1       responsibilities as a correctional officer.
 2   A   Yes.
 3   Q   What was the end date of your employment as a
 4       corrections officer for Polk County?
 5   A   October 30, 2014.
 6   Q   All right.
 7             (Exhibit No. 2 marked for
 8              identification)
 9             MS. LUBINSKY:  Off the record.
10             (Discussion off the record)
11   Q   I'm going to show you Exhibit 2.  This is a
12       document I got from your personnel file.  Are you
13       familiar with this document?
14   A   Yes.
15   Q   All right.  The beginning paragraph indicates that
16       there was a meeting in June of '96 where the
17       Wisconsin Law Enforcement Standards Board
18       certified you as being qualified to be a jail
19       officer.  Do you see that?
20   A   Yes.
21   Q   So you held that certification at least when you
22       commenced or began employment with Polk County,
23       true?
24   A   True.
25   Q   And then do you have to -- did you have to undergo
```

Page 9

1 any sort of recertification along the way or no?
2 A If I remember right, yes, every two years you had
3 to have, I believe, 24 hours of continuing
4 education.
5 Q Could you outline for me briefly what your formal
6 education is starting with -- did you graduate
7 high school?
8 A Yes.
9 Q Where did you go to high school?
10 A Clear Lake, Wisconsin.
11 Q What year did you graduate?
12 A 1984.
13 Q And then thereafter did you pursue any post high
14 school education?
15 A Nothing that was, you know, a year, a two-year
16 program. I took numerous 60-hour, 90-hour courses
17 for fire training and EMS.
18 Q Did you take any sort of courses that relate,
19 other than the fire and EMS courses, that would
20 relate to being a corrections officer for
21 Polk County?
22 A Nothing on my own, only if -- like I said, you had
23 to maintain certification every two years, so I
24 believe twice I was sent to jail officer
25 recertification. And then they started doing

Page 10

1 in-house recertification, so we didn't travel
2 anymore.
3 Q Do you recall where you did that out-house
4 recertification?
5 A I believe both of them were through
6 Chippewa Valley Technical College in Eau Claire.
7 Q And then when you did that on those two occasions,
8 was that a week-long program?
9 A Three days.
10 Q So three days each time?
11 A Yeah. It was 24 hours, 8 hours a day I think,
12 somewhere around there.
13 Q All right. Just turning back to Exhibit 2. What
14 did you have to do to become certified as a jail
15 officer?
16 A Back then it was just a four-week certification
17 class, same thing at CVTC in Eau Claire, Monday
18 through Friday.
19 Q Were there course materials that you had during
20 that week-long process?
21 A Yes.
22 Q All right. Do you happen to still have those or
23 have --
24 A No.
25 Q -- access to those?

Page 11

1 A No.
2 Q I wouldn't expect you would.
3 All right. When you went back -- on the
4 two occasions where you went back to the
5 Chippewa Valley Technical College for your
6 recertification, likewise, were there, like,
7 materials that you were --
8 A Yes.
9 Q -- provided?
10 I assume you still do not have them; is
11 that --
12 A No.
13 Q -- true?
14 A No.
15 Q My statement was true; you don't have them?
16 A Yes, correct.
17 Q Do you have any memory of approximately what time
18 frame you went back to Chippewa Valley Technical
19 College to do the two recertifications?
20 A This was '96. '98 and 2000.
21 Q And are you --
22 A Springtime maybe.
23 Q Are you thinking that because after a certain
24 point then Polk County did all of its
25 certification training in-house?

Page 12

1 A Yes.
2 Q I think I've got a document on that later, so
3 we'll get to that.
4 While you were taking the four-week program
5 that then qualified you to be a certified jail
6 officer, did you receive any training relative to
7 having contact with inmates of a sexual nature?
8 A Yes.
9 Q What I'm looking for is what type of training you
10 received. Was it just a verbal presentation, or
11 did somebody go through the laws with you? What
12 do you remember about that?
13 A I can't remember which instructor it was, but I
14 believe it was just verbal. Back then there was
15 no videos or --
16 Q I understand IT was not big in the mid '90s.
17 A Exactly, exactly, yes. I believe it was just a
18 professor from the college that came in and spoke.
19 Q Nonetheless, were you trained back before you were
20 certified on the idea that it was unlawful for
21 jail officers to have sexual contact with inmates?
22 A Yes.
23 Q All right. And do you recall whether that
24 concept, that generally came up in either of the
25 two recertifications that you attended? And by

Case: 3:15-cv-00433-wmc   Document #: 32-2   Filed: 06/10/16   Page 4 of 14

J.K.J. / M.J.J. v.                                                    Deposition of Darryl L. Christensen
Polk County Sheriff's Department, et al.                                                 May 18, 2016

**Page 13**

1     that I mean after you were originally certified,
2     you went to Chippewa Valley Technical College on
3     two occasions for the three-day stints. Do you
4     recall the topic of having sexual contact with
5     inmates, do you recall that topic coming up on
6     either of those two?
7 A  Not in the refresh --
8         MR. DE VRIES: Objection, compound.
9     Go ahead.
10 Q  Go ahead.
11 A  Not in the refresher classes. The refresher
12     classes were condensed down to self-defense
13     classes and use of weapons. Some jails were
14     allowed to use batons or stun guns back then
15     before the TASERs, so we had training on those
16     things, update on fire procedures, things like
17     that. The research was really slim on book work
18     stuff.
19 Q  And we're going to talk about the in-house
20     training in a minute, but just to complete where
21     I'm going, did you have any other training of any
22     kind outside of training that was provided to
23     Polk County relating to the concept of
24     correctional officers having sexual contact with
25     inmates?

**Page 14**

1 A  Outside of the original four-week class, no, not
2     that I can recall, no.
3 Q  When you commenced or began employment with
4     Polk County, were you provided with a copy of a
5     policy and procedure manual for the jail?
6 A  Yes.
7 Q  And did you have -- perhaps not all in one
8     sitting, but did you have an opportunity to read
9     that?
10 A  Yes.
11 Q  All right. I want to just show you a couple
12     provisions in there, so we're going to mark a
13     couple documents.
14 A  Sure.
15        (Discussion off the record)
16        (Exhibit Nos. 3 through 6 marked
17        for identification)
18 Q  Sir, you have in front of you Exhibit 3.
19 A  Yes.
20 Q  And you notice the title of this policy is called
21     Inmate Rights?
22 A  Yes.
23 Q  It has an effective date of February 3, 2003 but
24     then includes two revision dates dating through
25     1/22/11. Do you see that?

**Page 15**

1 A  Yes.
2 Q  And then just for the interest of completeness,
3     why don't you also look at Exhibit 4.
4 A  Okay.
5 Q  Do you see this is the same policy with the same
6     effective date?
7 A  Yes.
8 Q  And do you see there's an additional revision
9     date --
10 A  Yes.
11 Q  -- of 2/9/13?
12 A  Yes.
13 Q  Was it generally your understanding that over time
14     Polk County would on occasion update various
15     policies that it had in its policy and procedure
16     manual for the jail?
17 A  Yes.
18 Q  All right. We can look just at Exhibit 3 because
19     the point I want to talk with you about didn't
20     change, okay?
21 A  Okay.
22 Q  So we'll look at Exhibit 3. You've already said
23     you were familiar with the policy, so I'm
24     assuming -- please tell me if I'm wrong -- were
25     you, in fact, familiar with this policy?

**Page 16**

1 A  Yes.
2 Q  And pursuant to the policy, you understood that --
3     and I'll get there. One moment. I'm turning --
4     do you see they're paginated at the bottom?
5 A  Yes.
6 Q  Turn to page 247. Under Item No. 5 -- I'll just
7     read it. Tell me if I've read it accurately.
8        "Under no circumstances will any inmate be
9     the object of verbal, physical, emotional,
10     psychological or sexual harassment by facility
11     staff. Any officer engaged in such actions is
12     subject to disciplinary charges and/or
13     termination."
14        First of all, did I read that accurately?
15 A  Yes.
16 Q  And you were aware that that was, in fact, a
17     policy at Polk, the Polk --
18 A  Yes.
19 Q  -- County Jail?
20        And if you could just briefly turn to
21     Exhibit 4, to page 272. You'll see under Item 5
22     that that same policy existed when the policy was
23     revised in February of '13, true?
24 A  True.
25 Q  All right. Now we'll go to Exhibit 5, please.

Case: 3:15-cv-00433-wmc   Document #: 32-2   Filed: 06/10/16   Page 5 of 14

J.K.J. / M.J.J. v.                                                    Deposition of Darryl L. Christensen
Polk County Sheriff's Department, et al.                              May 18, 2016

Page 17

1  Exhibit 5 is entitled FRATERNIZATION WITH
2  INMATES/PREA. Do you see that?
3  A  Yes.
4  Q  And at least with respect to Exhibit 5, we've got
5  an effective date of November 18, 2007 with a
6  revision date of July 18, 2012. Do you see that?
7  A  Yes.
8  Q  And in the interest of completeness, I'll show you
9  Exhibit 6. Do you see that as in effect the same
10 policy but with another update, revision date of
11 2/7/13?
12 A  Yes.
13 Q  All right. Let's go back to Exhibit 5. Turn to
14 enumerated page 46. Do you see under Roman
15 numeral V there is a section entitled PREA, which
16 is labeled PRISON RAPE ELIMINATION ACT; do you see
17 that?
18 A  Yes.
19 Q  Were you generally aware, perhaps not with all the
20 intricacies, but that there was a law that
21 prohibited correctional officers from having
22 sexual contact with inmates?
23 A  Yes.
24 Q  All right. Turn to the next page, the paragraph
25 labeled H. It's kind of right at the top.

Page 18

1  A  Yes.
2  Q  And I'll just read it quickly here. It says "In
3  addition to Department policies against sexual
4  misconduct, Wisconsin State Statutes make it a
5  criminal offense for correctional staff members to
6  have sexual intercourse or contact with an
7  individual confined in a correctional
8  institution."
9     First of all, did I read that accurately?
10 A  Yes, yes.
11 Q  And you knew, having read the policies of
12 Polk County, that that was, in fact, the policy of
13 Polk County, true?
14 A  True.
15 Q  And you knew that it was against Wisconsin
16 criminal statutes for a correctional officer to
17 have sexual intercourse or sexual contact with
18 inmates, true?
19 A  True.
20 Q  All right. And then we'll just briefly go to
21 Exhibit 6 when the policy was updated in 2013. We
22 can go to the third page there. You'll see that
23 there's still a section on the PREA, the
24 Prison Rape Elimination Act, correct?
25 A  Yes.

Page 19

1  Q  And Subsection H on the next page is identical to
2  what we've already covered, true?
3  A  True.
4  Q  Put those in whatever pile you're making.
5        (Exhibit No. 7 marked for
6         identification)
7  Q  We talked earlier about some in-house training
8  that you received from Polk County.
9  A  Yes.
10 Q  Have you ever seen Exhibit 7 before?
11 A  Yes.
12 Q  This was a document that was produced in discovery
13 in this matter. I got it from your personnel
14 file. And it purports I think to document some
15 in-house training you received. Is that what you
16 understand the document is?
17 A  Yes.
18 Q  All right. Did you ever personally keep track of
19 the nature of the training, in other words, what
20 the topics were --
21 A  No.
22 Q  -- that they were training you on that's reflected
23 in this document?
24 A  No.
25 Q  Okay.

Page 20

1        (Exhibit No. 8 marked for
2         identification)
3  Q  I'm showing you what's been marked as Exhibit 8.
4  I'll represent to you again this is a document
5  that was produced in discovery in this matter.
6  First of all, do you see it's an e-mail?
7  A  Yes.
8  Q  There is an e-mail address up near the top that
9  says Darryl@co.polk.wi.us. Was that, in fact,
10 your e-mail address that you used?
11 A  Yes.
12 Q  And you can just skim this real quick. My first
13 question is do you recall receiving this e-mail?
14 A  No.
15 Q  The e-mail purports to recap some information from
16 a training that occurred the day prior. And on
17 the second bullet there is a section labeled PREA.
18 A  Yes.
19 Q  Let me ask the question much more generally then.
20 Do you recall that at any of the in-house
21 trainings that Polk County offered or provided to
22 its correctional officers that the topic of the
23 Prison Rape Elimination Act came up during those
24 trainings?
25 A  No.

J.K.J. / M.J.J. v.
Polk County Sheriff's Department, et al.

Deposition of Darryl L. Christensen
May 18, 2016

Page 29

1   (Exhibit No. 11 marked for
2   identification)
3 Q I'm showing you what's been marked as Exhibit 11.
4   Take a moment just to page through it. I'll
5   represent to you I accurately copied a copy of the
6   criminal complaint.
7 A Yes.
8 Q But page through it real quick and just tell me if
9   this appears to you -- there may be a redaction on
10  one of the pages, but does it appear to you to be
11  a copy of the criminal complaint?
12 A Yes.
13 Q And ultimately you were charged with five counts
14  of sexual assault, true?
15 A True.
16 Q I want to focus in on MJJ first.
17 A Okay.
18 Q If you could go to page 11 of Exhibit 11.
19 A Okay.
20 Q All right. Do you understand that the initials
21  MJJ that are referenced on this page refer to
22  MJJ ?
23 A Yes.
24 Q All right. And I'm not going to read it. This,
25  though, recounts allegations Ms. MJJ made about

Page 30

1   various times that you and her had some form of
2   sexual contact. First of all, do you agree that's
3   what this document says?
4 A Yes.
5 Q All right. I'm sorry. I don't have the
6   presentence investigation report with me today.
7   Was there more -- strike that.
8       Were there different allegations in terms of
9   what MJJ had said had happened between you
10  two that were contained in the presentence
11  investigation, if you recall?
12      MR. DE VRIES: Objection to the
13  form of the question. If you can answer it,
14  go ahead. It's very broad.
15 A I was going to say I don't --
16 Q If you don't understand, don't answer.
17 A Yeah, I don't understand.
18 Q Okay. As you sit here today, do you have a memory
19  that the pre-sentence investigation report raised
20  new allegations that Ms. MJJ had made that
21  weren't in the criminal complaint?
22 A I know there were allegations in both that I
23  didn't agree with, but --
24 Q Okay.
25 A Yes.

Page 31

1 Q I'm assuming then you're just not sure if they
2   were identical --
3 A Exactly.
4 Q -- or if there were more?
5 A Correct.
6 Q That's fair enough. When you read through the
7   allegations in the criminal complaint,
8   Exhibit 11 --
9 A Yes.
10 Q -- that's in front of you that relate to
11  Ms. MJJ were there areas of what she
12  alleged -- were there things she said in here that
13  you disagreed with?
14 A Yes.
15 Q All right. Then we're going to go through it
16  briefly.
17 A Okay.
18 Q First of all, I'm looking at the first paragraph.
19  I assume you would agree she was incarcerated in
20  the Polk County Jail on numerous occasions?
21 A Yes.
22 Q All right. So let's go to the next paragraph.
23  According to this document, she had alleged that
24  during her jail time between November 3, 2011 and
25  January 22, 2014 that she was incarcerated nine

Page 32

1   different times. Do you remember her kind of
2   coming in -- regardless of how many times, do you
3   remember her coming in and out of jail on several
4   occasions?
5 A Yes.
6 Q She alleges that you kissed her and then would put
7   your hand under her jail uniform, under her
8   underwear, and insert your finger into her vagina
9   and that this occurred more than 24 times but less
10  than 100. So let me stop right there.
11      Do you agree that, in fact, those actions
12  occurred? And if you disagree that any of that
13  occurred, itemize for us what you disagree with.
14 A I disagree with the dates, first of all,
15  November 2011.
16 Q When do you believe -- strike that.
17      When do you contend you first had any contact
18  of a sexual nature with Ms. MJJ
19 A Early 2012 maybe.
20 Q And did the sexual contact you had with her,
21  whatever it is, which we'll get into in a moment,
22  did it continue perhaps on and off but through
23  approximately January 22, 2014?
24 A Yes.
25 Q All right. I understand that disagreement. Now,

Case: 3:15-cv-00433-wmc   Document #: 32-2   Filed: 06/10/16   Page 7 of 14

J.K.J. / M.J.J. v.                                                    Deposition of Darryl L. Christensen
Polk County Sheriff's Department, et al.                                              May 18, 2016

**Page 33**

1  when she describes the nature of the sexual
2  contact you had -- first of all, she alleges you
3  kissed her. Did that occur?
4  A  Yes.
5  Q  And right now I'm not so worried about how many
6  times.
7  A  Exactly.
8  Q  On one or more occasions did you put your hand
9  under her jail uniform?
10 A  Yes.
11 Q  On one or more occasions did you put your hand
12 under her underwear?
13 A  Yes.
14 Q  On one or more occasions did you insert your
15 fingers into her vagina?
16 A  Yes.
17 Q  I'm guessing that we have a disagreement over how
18 many times?
19 A  Yes.
20 Q  According to this, she alleges it occurred some
21 time between 24 and 100 times. What is your
22 testimony as to how often this occurred or how
23 frequently, better word?
24        MR. DE VRIES: You'll have to go
25 through each one.

**Page 34**

1         THE WITNESS: Pardon?
2         MR. DE VRIES: Go through each one.
3  Q  Well, I'll ask the questions. Can you quantify
4  approximately how many times it occurred? And if
5  you can't, then we'll do it a different way.
6  A  If I were to quantify it, I would say 15 to 20.
7  Q  I'm not going to go through each time.
8  A  Oh, good. Thank you.
9  Q  But on those 15 to 20 times, do you have, like, a
10 specific memory of each time and what happened?
11 A  No.
12 Q  Then I'm going to move on.
13        MR. DE VRIES: Can I make sure
14 we're --
15        MS. LUBINSKY: Sure.
16        MR. DE VRIES: You said about
17 15 times. Does that mean 15 times of any
18 contact at all or -- I just want to make sure
19 the record is clear.
20        MS. LUBINSKY: Sure. I'll clean
21 that up.
22        MR. DE VRIES: I think we got it,
23 but I just want to make sure.
24 Q  Is it your testimony that between 15 and 20 times
25 you had some form of sexual contact with

**Page 35**

1     Ms. MJJ
2  A  Exactly, yes.
3  Q  I got it. All right. And I'm assuming -- you
4  tell me if I'm wrong -- the nature of the sexual
5  contact might have varied?
6  A  Exactly.
7  Q  But at least on one occasion you kissed her,
8  right?
9  A  Yes.
10 Q  At least on one of those occasions you put your
11 hand under her jail uniform?
12 A  Yes.
13 Q  And we've gone over that, so I don't need to --
14 A  Correct.
15 Q  -- do that again.
16 A  Correct.
17 Q  In terms of location, did the location of the
18 15 to 20 sexual interactions, did it vary?
19 A  On a couple of occasions, yes.
20 Q  So the majority of those 15 to 20 occasions, tell
21 us where it occurred.
22 A  Outside the bubble door near the medical cells.
23 Q  And then on those occasions where it wasn't
24 there -- and if there were several, tell us --
25 where else did the sexual contact occur with

**Page 36**

1     MJJ
2  A  The X-cell. I don't know if she says that.
3  Q  Don't worry about what she says.
4  A  Okay.
5  Q  Just give me your best memory.
6  A  X-2, I believe is what it's labeled as in the
7  jail.
8  Q  Is that like a room?
9  A  It's an exercise room.
10 Q  Okay.
11 A  It's just off of max pod.
12 Q  Other than outside the bubble near the medical
13 cells and other than the X-room or exercise room,
14 was there any other location where you had any
15 form of sexual contact with  MJJ  while in
16 the Polk County Jail?
17 A  As long as we're saying any form, then I will
18 agree, yes, the receiving cell in booking.
19 Q  At the bottom of page 11 it says "Many times
20 during these same incidents the defendant would
21 pull his penis out of his uniform pants and have
22  MJJ  touch his penis."
23      Don't worry about how many times because I
24 understand that. On one or more occasions did
25  MJJ  have physical contact with your penis?

Case: 3:15-cv-00433-wmc   Document #: 32-2   Filed: 06/10/16   Page 8 of 14

| J.K.J. / M.J.J. v. | Deposition of Darryl L. Christensen |
| Polk County Sheriff's Department, et al. | May 18, 2016 |

Page 37

1 A  Yes.
2 Q  There's a statement at the top of page 12 that
3    says "The defendant" -- which is you, so I'll read
4    it this way. The allegation there is you told
5    MJJ not to tell anyone what you had done or
6    you would lose your job. Did you make that
7    statement to her on one or more occasions?
8 A  Yes.
9 Q  And presumably that is because you knew what you
10    were doing was wrong?
11 A  Yes.
12 Q  And presumably that was also because not only did
13    you know what you were doing was wrong but you
14    knew you would lose your job?
15 A  Correct.
16 Q  And you knew it was against the criminal code in
17    Wisconsin?
18 A  Yes.
19 Q  All right. Next paragraph. There is an
20    allegation that -- again, don't worry about the
21    dates for a moment -- that she basically performed
22    oral sex on you an estimated two dozen up to
23    50 times. First of all, did she perform oral sex
24    on you on at least one occasion?
25 A  Yes.

Page 38

1 Q  Do you recall how many times that occurred?
2 A  A dozen.
3 Q  Would that dozen be within the 15 to 20 that we
4    talked about earlier?
5 A  Yes.
6 Q  Got it.
7 A  But not -- like you said, not, not every time was
8    the same thing done, yes.
9 Q  Sure. I'm understanding, given that you think it
10    was about 12, that there were probably instances
11    where you had sexual contact with MJJ that
12    did not involve her giving you oral sex?
13 A  Correct.
14 Q  Got it. The next paragraph talks about penis to
15    vaginal intercourse. Did that occur on at least
16    one occasion?
17 A  No.
18 Q  Did you have intercourse of any kind with
19    MJJ other than oral sex?
20 A  No.
21 Q  There's an allegation about the booking room, and
22    you referenced that earlier. Was there some
23    sexual contact that --
24 A  Yes.
25 Q  -- occurred?

Page 39

1    What was the nature of that conduct that you
2    can recall?
3 A  We kissed.
4 Q  Was that it?
5 A  Yes. I saw her in just her underwear because
6    she -- I gave her a jail uniform, and before I
7    could leave she took her pants off and threw her
8    pants out, put the jail uniform on.
9 Q  Turn the page to page 13, still in Exhibit 11. It
10    talks about the last incarceration period, and she
11    again claimed she had sexual intercourse with you
12    on two occasions. I assume your testimony is that
13    did not occur?
14 A  Correct.
15 Q  The next paragraph down talks about the final time
16    of -- she alleges intercourse was in the bathroom
17    in the X-room. Just for my interest of
18    completeness, is that the same -- that's the
19    exercise room?
20 A  Correct.
21 Q  What sexual contact do you recall occurring with
22    MJJ in that room?
23 A  We kissed, and then we left because that was -- as
24    a jail officer for the max pod area, that was too
25    far out away from the max pod to be able to hear

Page 40

1    the phone ring or to see anything, what the
2    inmates were doing on the cameras, if anybody was
3    pushing an intercom button to get my attention.
4 Q  Give me a sense -- I didn't tour the jail. Some
5    of the others did. How far away is that X-room
6    from where you were stationed?
7 A  The door is probably from where you're sitting to
8    the wall behind you. It's just a small hallway
9    that goes between the two.
10 Q  Okay.
11 A  Guard walk or catwalk we call it.
12 Q  When you were having your sexual contact with
13    MJJ outside the bubble door, was that --
14    I'm sorry, outside the bubble door and near the
15    medical cells, could you still maintain a visual
16    contact with the area where you were supervising?
17 A  Yes.
18 Q  To the best of your memory, was there only one
19    occasion where you had any form of sexual contact
20    with MJJ in the exercise or the X-room?
21 A  Yes.
22 Q  There's an allegation midway through on page 13
23    that there were -- there was at least one time,
24    perhaps more, where you had asked or directed
25    MJJ to put on a show for you. Did that

Case: 3:15-cv-00433-wmc   Document #: 32-2   Filed: 06/10/16   Page 9 of 14

J.K.J. / M.J.J. v.                                           Deposition of Darryl L. Christensen
Polk County Sheriff's Department, et al.                                        May 18, 2016

**Page 41**

1  occur in any form?
2       MR. DE VRIES: Objection. That's
3   compound.
4  Q  You can go ahead and answer. Let me try to clear
5   it up.
6       There's an allegation, if you look at page 13
7   of Exhibit 11, that she went to the X-room to walk
8   laps around the room for exercise. From the
9   bubble you directed her to put on a show. Do you
10  recall that occurring?
11 A  I recall her going in there and doing that, but I
12  didn't direct her to do it, no.
13 Q  What about asking or directing her to put on a
14  show; did that happen?
15 A  No.
16 Q  All right. Was the bathroom door in the X-room a
17  locked door?
18 A  Yes.
19 Q  So in order to get inside that bathroom, would you
20  need keys to get in?
21 A  Yes.
22 Q  Did you and MJJ ever go into that bathroom
23  door?
24 A  Just that one time, yes.
25 Q  And that's the time where you just kissed?

**Page 42**

1  A  Yes.
2  Q  Got it. There's an allegation at the bottom of
3   page 13 that when MJJ would go to pick up
4   medications at the medication cart you would tell
5   her to put her hand on your crotch outside your
6   uniform pants. She did what she was told between
7   24 and -- I'm sorry, between 12 and 24 occasions.
8       First of all, on at least one occasion were
9   there times where when she was getting medications
10  you would ask her or direct her to put her hand on
11  or near your crotch?
12 A  No.
13 Q  So that never happened?
14 A  No. The medication -- or the max pod bubble
15  officer was literally sitting here (indicating),
16  and she would -- say there was a gate between you
17  and I to hand out medications. That officer was
18  looking -- I mean, as I'm handing out medications,
19  the officer was watching to make sure, so no.
20 Q  And presumably you know that -- strike that.
21      So what you're telling me is if that
22  occurred, it would have been easily detected?
23 A  Exactly.
24 Q  And the actions you engaged in with her were
25  designed to avoid detection?

**Page 43**

1  A  Correct.
2  Q  Next page. MJJ alleges that she saw you
3   masturbate under the light of the bubble when you
4   would direct her attention toward you by shining
5   the light from the bubble. Basically she
6   indicates that she -- you would impliedly ask her
7   to watch you masturbate. First of all, did this
8   occur?
9  A  No.
10 Q  Never?
11 A  Never.
12 Q  Okay.
13 A  As I was telling --
14 Q  Don't tell me what you told Marty. I'm not
15  entitled to know that.
16 A  All right.
17 Q  I don't want to invade privilege, okay?
18 A  Okay.
19 Q  All right. Still within Exhibit 11 because I
20  think this is going to be the easiest way to do
21  it. Let's jump from MJJ to JKJ
22 A  Okay.
23 Q  Turn to page 4. All right. We'll kind of go
24  through this the same way we just did --
25 A  Sure.

**Page 44**

1  Q  -- all right?
2  A  Yep.
3  Q  Skip the first paragraph. The next paragraph
4   talks about the fact that JKJ was in the
5   Polk County Jail again at various times. Would
6   you agree there were kind of stints, if you will,
7   where she was in and out of the jail?
8  A  Yes.
9  Q  The first allegation is that during her
10  incarceration between July 1 of 2012 and
11  August 31, 2012, so about two months, she alleges
12  you directed sexual comments to her. Did that
13  occur?
14 A  I wouldn't say I directed sexual comments towards
15  her. I participated in their sexual talk that was
16  going on.
17 Q  With the inmates?
18 A  Exactly.
19 Q  Do you have a memory of the sorts of things? I
20  don't need every example, but can you give us one
21  or two examples of the sorts of things that you
22  participated in during that time frame.
23 A  I guess some of the times when I would walk in, go
24  into the cell block, whether it was to get
25  cleaning supplies out or to just do a cell check

Page 45

1    in there, they were watching TV. If there was a
2    show on TV, like a soap opera, which they watched
3    a lot, and they were having sex, then right away
4    the cell block women are talking about sex acts
5    and stuff. And I would start, you know, joining
6    in in the conversation about it.
7  Q All right. That's a good example. Still on that
8    same page, bottom, she says in August of 2012 the
9    first sexual intercourse occurred between them.
10   Did you have sexual intercourse with JKJ
11   on one or more occasions?
12 A Not in the jail.
13 Q Did you have sexual intercourse with her outside
14   of the jail?
15 A Yes.
16 Q How many occasions did you have actual sexual
17   intercourse?
18 A Two.
19 Q And was that penis to vagina sexual intercourse?
20 A Yes.
21 Q And did those occur at the fire department?
22 A Yes.
23 Q I'm sensing from my review of the records, if my
24   memory is accurate, that was actually later than
25   2012, or was it --

Page 46

1  A Around, yeah, 2013.
2  Q Okay.
3  A Late '12, early '13, somewhere around there.
4  Q In the second paragraph -- you can turn to page 5.
5    She talks about an area near the medical isolation
6    cell, which is designated in the jail as the
7    X-room or conference room directly off the bubble.
8    She talks about you and her making out.
9    Eventually you touched her beneath her underwear
10   and put your finger into her vagina.
11      So we'll do this like we did last time. With
12   respect to JKJ, on one or more occasions
13   did you kiss her?
14 A Yes.
15 Q And on one or more occasions did you touch her
16   beneath her underwear?
17 A Yes.
18 Q On one or more occasions did you put your finger
19   into her vagina?
20 A Yes.
21 Q Collectively the sum total of all sexual
22   interactions with JKJ, are you able to
23   approximate how many times any form of sexual
24   interaction occurred between the two of you while
25   in the Polk County Jail?

Page 47

1  A More than five, less than ten.
2  Q In that same paragraph toward the end, she talks
3    about on one occasion you saying "You're not going
4    to say anything, right?" And she basically
5    responded saying no, she wasn't going to say
6    anything.
7       Do you recall having that type of
8    conversation with JKJ on one or more
9    occasions?
10 A Yes.
11 Q All right. And presumably -- tell me if I'm
12   right -- you asked her not to say anything because
13   you knew if she did, you would get in trouble?
14 A Yes.
15 Q You knew you would lose your job?
16 A Yes.
17 Q You knew it was criminal?
18 A Yes.
19 Q Turn to the top of page 6. There is an allegation
20   there that you pulled down your pants, and she
21   performed oral sex on you. Did that occur on at
22   least one occasion while in the jail?
23 A Yes.
24 Q Did it occur on more than one occasion?
25 A That she performed oral sex?

Page 48

1  Q Yes.
2  A Yes.
3  Q Would the number of occasions that that occurred,
4    would that be within that five to ten --
5  A No.
6  Q -- range?
7  A No. That would be less than five.
8  Q No. You misunderstood my question, so let me go
9    back.
10 A Okay.
11 Q The oral sex that she performed, is that part
12   of --
13 A Oh, yes, yes.
14 Q -- the five to ten?
15 A Yes.
16 Q Do you have an estimate for how many times
17   JKJ performed oral sex on you?
18 A Less than five I would say. If I would guess, I
19   would say three.
20 Q So I'm surmising then that there were times where
21   you had sexual contact with her of some form that
22   did not include oral sex?
23 A Exactly.
24 Q All right. I'm not sure I covered this earlier,
25   so about three-quarters of the way down there's an

Page 49

1  allegation that on one occasion she touched your
2  penis over your uniform. Did that occur on at
3  least one occasion?
4  A  Yes.
5  Q  How did it come to be that you had sexual contact
6     with JKJ outside the Polk County Jail?
7  A  She called the fire station phone number. The
8     answering machine gave out my cell phone number --
9  Q  Okay.
10 A  -- for non-emergencies. She texted me and asked
11    if I was at the fire station. She signed it JJ.
12    I have a female firefighter/EMT that's name is
13    Joy Jackson. I assumed it was her.
14 Q  Okay.
15 A  So I responded back and said Yes, I'll be there
16    this afternoon. While I was at the station, a
17    knock on the door. I went to the door, and it was
18    JKJ.
19 Q  So let me just back up. I'm assuming she was out
20    of jail?
21 A  Yes.
22 Q  All right. And you had scheduled or planned to be
23    at the fire station that day?
24 A  As a fire chief, I had to put in 20 hours a week,
25    yes.

Page 50

1  Q  Do you still have access to the text message
2     string?
3  A  No.
4  Q  And so when she comes and shows up, I assume you
5     are a bit surprised because you anticipated it was
6     somebody else?
7  A  Correct.
8  Q  What happened next?
9  A  She came in. She asked for a tour of the fire
10    station. I showed her the fire trucks, took her
11    throughout the station, showed her my office,
12    showed her the men's and women's locker room. And
13    we started kissing in the locker room, and it
14    turned into sexual intercourse.
15 Q  I think I asked you this earlier. Do you think
16    that occurred in late '12, early '13?
17 A  Yes.
18 Q  All right.
19 A  I'm pretty sure there was snow on the ground.
20 Q  And were you working for the Amery Fire Department
21    at the time?
22 A  Yes. I was the chief at the time.
23 Q  And you were, like, kind of on duty at that time?
24 A  Yes.
25 Q  All right. And you said eventually the sexual

Page 51

1  contact with her on that occasion went to sexual
2  intercourse? Yes?
3  A  Yes.
4  Q  Did you use any sort of protection?
5  A  No.
6  Q  And was there another occasion where you had
7     sexual contact of any kind with her at the fire
8     station?
9  A  Yes.
10 Q  How long in time thereafter? Is this a short
11    period or years or --
12 A  No. It was the same year but months. She may
13    have even -- I don't know if she was back in jail
14    in between the times. I can't remember how she --
15    same thing, in and out, but it was months in
16    between.
17 Q  How did it come to be that she showed up or got to
18    the fire station? Did you ask her to come? Did
19    you contact her? Did she contact you?
20 A  It seems to me she did come back to jail, and we
21    spoke. And she said that while she was out she
22    had gotten a job as a masseuse at the health
23    center in the St. Croix Falls, and she was doing
24    massages. She had told me in the jail, she says
25    that You must -- you must get stressed out with

Page 52

1  all your jobs here and at the fire station. If
2  you ever need a massage, let me know.
3  Q  Okay.
4  A  When she was out, I don't remember if she had
5     texted me again and I got her phone number off of
6     that, but somehow I had texted her and said that I
7     would take her up on the offer for a massage. We
8     had a building fire, and a roof collapsed on one
9     of my firemen. I climbed in the window and lifted
10    the stuff off and pulled a muscle in my shoulder.
11    So we set a date. She came to the fire station.
12 Q  You know, I forgot to ask you. On the first
13    occasion where she came to the fire station, was
14    anyone else there other than --
15 A  No.
16 Q  -- the two of you?
17    Same question for the second occasion. Was
18    anyone else there?
19 A  (Negative head nod).
20    COURT REPORTER: Is that a yes or
21    no?
22 A  No.
23 Q  Let's confirm that. Nobody else was there,
24    correct?
25 A  Correct.

**Page 53**

1  Q   And were you on duty?
2  A   Yes.
3  Q   So she came, whether it was you calling her or
4      texting her or her contacting you, she came there
5      under the purpose of giving you a massage?
6  A   Correct.
7  Q   And then I assume when she got there, that did
8      occur?
9  A   Yes.
10 Q   Did it turn into a sexual interaction of some
11     kind?
12 A   Yes.
13 Q   Did it turn into sexual intercourse?
14 A   Yes.
15 Q   Was that the second occasion, and then have we now
16     completed all of the actual sexual intercourse you
17     had with her?
18 A   Yes.
19 Q   And that sexual intercourse occurred at the fire
20     station?
21 A   Yes.
22 Q   And just so we've got a nice clear record, on the
23     two occasions where she came to the fire station
24     where you had sexual intercourse with her, she was
25     not a Polk County inmate, true?

**Page 54**

1  A   Correct.
2  Q   And you were not working for Polk County at the
3      time?
4  A   Correct.
5          MR. WEIDNER: You mean the day of
6      the intercourse?
7  Q   Yes, the day of the intercourse.
8  A   Right. That's what I understood.
9  Q   Let me clean this up. Actually, on both occasions
10     while you were at the firehouse where the two acts
11     of sexual intercourse occurred, you were actually
12     working for Amery Fire Department at that time?
13 A   Correct.
14         (Exhibit No. 12 marked for
15          identification)
16 Q   Did you voluntarily terminate your employment with
17     Polk County before or after you came to understand
18     that one or more current or former inmates had
19     made allegations against you?
20 A   Yes, yes.
21 Q   So did -- let me go back.
22         Were you made aware from some source that
23     there had been some allegation of sexual contact
24     before you resigned?
25 A   Yes.

**Page 55**

1  Q   How were you made aware of that?
2  A   The chief deputy and I and the jail captain and
3      the human resource officer had a meeting.
4  Q   And what were you told in that meeting?
5  A   That there was allegations from an inmate that had
6      been moved from Polk County to Burnett County that
7      there had been sexual contact. And she told her
8      cellmate. That cellmate told it to a jail
9      officer. That jail officer contacted Polk County,
10     and that started the investigation.
11 Q   So when you were made aware of that allegation,
12     was it at that time that you resigned your
13     employment, or --
14 A   Yes.
15 Q   -- was there a period of time?
16 A   No, that day.
17 Q   And if my memory serves, you were asked to give an
18     interview or asked questions, but you declined to
19     give an interview and gave them your, like,
20     attorney's business --
21 A   Yes.
22 Q   -- card?
23 A   Yes.
24 Q   Did you ever speak with any law enforcement
25     officer detailing kind of the events that -- not

**Page 56**

1      only the two women that I've talked to you about
2      but the other women, have you ever spoken to a law
3      enforcement officer about your version of the
4      events?
5  A   No.
6  Q   Other than speaking with lawyers, which I'm not
7      entitled to know about --
8  A   Right.
9  Q   -- have you given an account of your version of
10     events regarding sexual interactions with any
11     inmates --
12 A   No.
13 Q   -- to anyone else?
14 A   Just the presentence investigation.
15 Q   Okay. You have in front of you Exhibit 12. I'll
16     represent to you I made a true and correct copy of
17     a transcript of the plea hearing --
18 A   Okay.
19 Q   -- where you pled to the charges. Do you
20     generally recall being present in the courtroom
21     when you pled to the charges?
22 A   Yes.
23 Q   All right. You were represented by counsel up to
24     and including on that date, true?
25 A   Correct.

Case: 3:15-cv-00433-wmc   Document #: 32-2   Filed: 06/10/16   Page 13 of 14

J.K.J. / M.J.J. v.                                                      Deposition of Darryl L. Christensen
Polk County Sheriff's Department, et al.                                                      May 18, 2016

Page 57

1  Q  And I'll represent to you this was not your
2     sentencing. That happened later.
3  A  Right.
4  Q  This was just your plea. Do you have a general
5     recollection of pleading guilty to the charges?
6  A  Yes.
7  Q  And did you understand that by pleading guilty you
8     were admitting to the allegations?
9  A  Yes.
10 Q  You've been sentenced on the -- strike that.
11    You understand after you pled guilty that the
12    Court found you guilty?
13 A  Yes.
14 Q  And then you've been sentenced and are in the
15    Waupun Correctional Institute at least right now,
16    true?
17 A  Dodge Correctional.
18 Q  I'm sorry. Dodge Correctional.
19 A  Yes.
20 Q  Do you know where you will be transferred to?
21 A  Here. I'm staffed here.
22 Q  So it's your understanding that you will remain
23    here?
24 A  Yes, at least until my next review date, which is
25    a year.

Page 58

1  Q  So I think that helps. If we ever have to come
2     back and speak with you, if it's --
3  A  Yes.
4  Q  -- in the next year, you're probably going to be
5     here?
6  A  Yes.
7  Q  Up until the time you are told by the chief deputy
8     and the jail captain and the human resources
9     person that there's been this allegation made, did
10    you have any idea that any other employee or
11    official of Polk County had any idea that you --
12    or any knowledge that you had been engaging in
13    sexual interactions with any inmate?
14 A  No.
15 Q  At least with respect to JKJ and
16    MJJ the sexual interactions you had with
17    them, did you conduct yourself in a manner so as
18    to avoid detection?
19 A  Yes, technically, yes.
20 Q  On any sexual interaction with any inmate, do you
21    know that anyone saw you?
22 A  No.
23 Q  You were engaging in the sexual actions with
24    MJJ for the sole purpose of your own
25    personal gratification, true?

Page 59

1  A  True.
2  Q  You weren't serving the interest of Polk County
3     when you engaged in sexual interactions with
4     MJJ, true?
5  A  True.
6  Q  And I'll just ask the same questions for
7     JKJ. When you engaged in the sexual
8     interactions with JKJ, you did it solely
9     for the purpose of your own personal motivation?
10 A  True.
11 Q  You did not engage in any sexual interactions with
12    JKJ to serve Polk County, true?
13 A  True.
14       MS. LUBINSKY: Okay. Those are all
15    the questions I have. Thank you. The other
16    lawyers might have a few.
17       (Discussion off the record)
18
19       EXAMINATION
20 By Mr. Bohl:
21 Q  Good afternoon, Mr. Christensen. We met before
22    the deposition started. My name is Charles Bohl,
23    and I represent Polk County.
24 A  Okay.
25 Q  Where did you first meet JKJ

Page 60

1  A  In jail.
2  Q  Where did you first meet MJJ ?
3  A  In jail.
4  Q  To your knowledge were either of these ladies
5     members of a nearby community?
6  A  No.
7  Q  Now, let me ask you some questions about your
8     meeting with 1 JKJ in the fire department.
9  A  Yes.
10 Q  She came to the fire department building, as far
11    as you know, on two occasions?
12 A  Yes.
13 Q  It wasn't more than two?
14 A  It was more than two but only two that there was
15    any sexual contact.
16 Q  About how many times did she come to the fire
17    department?
18 A  Four.
19 Q  Can you put these in chronologic order with the
20    ones in which there was sexual contact?
21 A  The first and the last were the sexual contact,
22    and there was two in the middle where she just
23    stopped in.
24 Q  Well, let me ask you then about the second time
25    she came. There was no sexual contact?

Page 73

1  roll her uniform pants down below her waistline
2  and pull her pants legs up. And I would say twice
3  that I can remember she removed her pants
4  completely and exercised in just her bra and
5  underwear.
6  Q  Did other female prisoners engage in this sort of
7     conduct?
8  A  Several over the years I've seen exercise with
9     their shirts off, yes, with their sports bra on.
10 Q  Was there a jail rule against this conduct?
11 A  It was a -- I don't know specifically because the
12    males were allowed to exercise without their
13    shirts on. The females, as long as they had their
14    sports bras on, some jailers let them; other
15    jailers didn't.
16 Q  Now, Mr. Christensen, I'm sure there's something
17    that -- there's a question that immediately comes
18    to mind listening to your testimony. You've
19    testified that you knew having sex with jail
20    prisoners was a crime?
21 A  Yes, sir.
22 Q  And you were repeatedly trained not to do it?
23 A  Correct.
24 Q  And you knew the policy of Polk County Sheriff's
25    Department was that you were not supposed to have

Page 74

1     sex with prisoners?
2  A  Yes, sir.
3  Q  As a matter of fact, you were not supposed to
4     fraternize with them in any sort of suggestive
5     way?
6  A  Correct.
7  Q  Nonetheless, you did, right?
8  A  Correct.
9  Q  Let's talk about MJJ: Were you fearful
10    that MJJ was going to make a complaint
11    against you?
12 A  No.
13 Q  Did she ever make a complaint against you?
14 A  No.
15 Q  Why were you not fearful that she would make a
16    complaint against you?
17 A  Because she, without placing blame, she was
18    initiative on several of the occasions. She had
19    told me that she had considered having an outside
20    the jail affair but changed her mind and said that
21    this was something that she wanted to keep just in
22    the jail so that if she ever came back she had
23    something she could look forward to.
24 Q  Where were you when you had this conversation in
25    which MJJ said that she had considered

Page 75

1     an outside the jail affair?
2  A  Outside the max pod, bubble area.
3  Q  Did she give you a reason why she only wanted to
4     have encounters with you in the jail?
5  A  She said it was something special that she could
6     look forward to if she ever came back to jail.
7  Q  How about JKJ were you fearful that
8     JKJ would make a complaint against
9     you?
10 A  No.
11 Q  Why not?
12 A  Again, without taking responsibility off of my
13    actions, she also initiated, and I went along with
14    it. So I felt that being she was initiating she
15    wasn't going to say anything.
16 Q  Did you form a belief in your mind as to whether
17    your sexual encounters with JKJ were
18    welcome on her part?
19 A  Yes.
20 Q  And did you form a belief in your mind as to who
21    was initiating the sexual conduct?
22 A  Yes.
23 Q  Who?
24 A  Her.
25 Q  Now, is the same true of MJJ that --

Page 76

1  A  Yes, sir.
2  Q  -- in your mind you believed that these sexual
3     encounters were welcome?
4  A  Yes, sir.
5  Q  And in your mind who did you believe was
6     initiating the sexual contact?
7  A  Her, sir.
8  Q  Now, you remember Chief Deputy Moe?
9  A  Yes, sir.
10 Q  Did Chief Deputy Moe to your knowledge have any
11    knowledge that you were having sex with anybody in
12    the jail?
13 A  No, sir.
14 Q  The criminal reports that have been given to us,
15    that I understand were initiated by DCI, indicate
16    that when Chief Deputy Moe was told that someone
17    in another county was saying that you were having
18    sex with jail prisoners that he began an
19    investigation within minutes. Have you read those
20    reports?
21 A  Yes.
22 Q  Do you believe that?
23 A  I don't remember the exact date that he was told
24    about this and when he started his investigation,
25    but I do remember that he said he acted on it