**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

M.J.J.,

       Plaintiff,

v.

POLK COUNTY SHERIFF'S DEPARTMENT
AND DARRYL L. CHRISTENSEN,           Civil Action No. 15-cv-433-wmc

       Defendants

And

WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION,

       Intervenor.

---

**PLAINTIFFS BRIEF IN RESPONSE TO DEFENDANT WISCONSIN COUNTY MUTUAL
INSURANCE CORPORATION'S MOTION FOR SUMMARY JUDGEMENT**

---

## INTRODUCTION

Law enforcement officers occupy a unique position of trust in our society. They are responsible for enforcing the law and protecting society from criminal acts. Within a jail, they are responsible for protecting individuals within their care. While a jail, an inmate is 100% at the whim of a jailer. The jailer is responsible for allowing an inmate to take a shower, the only source of food for an inmate, allowing an inmate access to reading materials, allowing an inmate access to friends and family, and allowing an inmate access to their attorney or probation agent, amongst other things. A jailer has the ability to put an inmate in a segregation unit, to put an inmate into a medical cell, to lock and unlock an inmate from accessing their bed, and controls every single aspect of an inmate's life while they are incarcerated. As visible symbol of this

formidable power, a jailer wears a uniform, badge, and carries a weapon, such as a Taser or baton. Inmates who challenge a jailer's actions do so at their own peril. Inmates' necessities and liberties such as food, reading materials, ability to shower, access to friends and family, etc. can be taken away in an instant by an overzealous jailer.

The thrust of the Summary Judgment motion from Wisconsin County Mutual Insurance Company ("WCMIC") is whether or not Christensen was acting "within the scope of his employment" when he sexually assaulted inmates that he was charged, as an employee of the Polk County Sheriff's Department, to protect. Given the immense power and authority that is granted to a jailer, the definition of "scope of employment" is greater than that of any other profession and, as such, Christensen was acting within his "scope of employment" when he sexually assaulted Plaintiff and is an "insured" under WCMIC's policy issued to the Polk County Sheriff's Department ("Polk County").

In addition, the conduct of Defendant Darryl Christensen ("Christensen") does not fall under any of the WCMIC insurance policy exclusions which would preclude coverage for his actions.  As such, WCMIC's summary judgment motion should be denied in full.

## DOCUMENTS COMPRISING THE RECORD

1. Affidavit of David Bisek, Docket No. 13, Ex. 4
2. Deposition transcript of M.J.J. taken on April 5, 2016, Docket No. 45
3. Deposition transcript of Darryl Christensen taken on May 19, 2016, Docket No. 47
4. Deposition transcript of Scott Nargis taken on June 2, 2016, Docket No. 49
5. Affidavit of Lida Bannink dated July 8, 2016

## FACTS

See Plaintiff's Proposed Findings of Fact ("PPFF") as well as admissions made to Wisconsin County Mutual Insurance Corporation's Findings of Fact ("IPFF").

## ARGUMENT

### I.   Summary Judgment Standard of Review.

It is well known that summary judgment is to be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." (WCMIC Br. 2, *quoting* Fed. R. Civ. P. 56(c)).

However, summary judgment is a "form of relief which should be applied with caution to the end that litigants be allowed a trial on bona fide factual issues." *International Association of M. & A. W. Dist. No. 8 v. Clark Company*, 471 F.2d 694, 697 (7th Cir. 1972). Summary judgment is never warranted except on a clear showing that no genuine issue as to any material fact remains for trial. *Shultz v. Manufacturers and Traders Trust Company*, 1 F.R.D. 451 (W.D.N.Y.1940); *Peoples Outfitting Co. v. Gen. Elec. Credit Corp.*, 549 F.2d 42, 45 (7th Cir. 1977). In evaluating a motion for summary judgment, a court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party when determining whether a genuine issue of material fact exists. *Simpson v. Merchants Recovery Bureau, Inc.*, 171 F.3d 546, 551 (7th Cir. 1999).

In *First Nat'l Bank of Arizona v. Cities Service Co.*, the United States Supreme Court made clear that to defeat summary judgment the opposing party need only demonstrate a factual dispute requiring a trial:

> [T]he issue of material fact required by Rule 56(e) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

391 U.S. 253, 288-289 (1968).

3

Because the scope-of employment issue involves question of intent and purpose, generally it presents a question of fact. *Destolle v. Continental Case Co.*, 136 Wis.2d 13, 26-28, 400 N.W.2d 524, 528-29 (Ct. App. 1986). Even when the basic facts are undisputed, competing inferences may often be drawn from the facts. *See Cameron v. City of Milwaukee*, 102 Wis.2d 448, 460, 307 N.W.2d 164, 170 (Ct. App. 1986). For judgment to be granted as a matter of law, the act must be so wholly unconnected to the employee's duties that no intent to further the employer's purpose can be inferred. *See Linden v. City Car Co.*, 239 Wis. 236, 300 N.W. 925, 926 (1941).

## II.   <u>Insurance Policy Interpretation</u>

Courts are to interpret the language of an insurance policy according to its plain and ordinary meaning as understood by a reasonable person in the position of the insured. *Kremers– Urban Company v. American Employers Insurance,* 119 Wis.2d 722, 735, 351 N.W.2d 156, 163 (1984). The first task in construing an insurance policy is to determine whether there is ambiguity with respect to the disputed coverage. *Badger Mut. Ins. Co. v. Schmitz,* 2002 WI 98, ¶ 51, 255 Wis.2d 61, 647 N.W.2d 223. If the language is ambiguous, that is, if it is fairly susceptible to more than one reasonable interpretation when read in context, *Peace ex rel. Lerner v. Nw. Nat. Ins. Co.*, 228 Wis. 2d 106, 154, 596 N.W.2d 429, 450 (1999), courts must construe the policy in favor of coverage and construe the exclusions narrowly against the insurer. *Smith v. Atlantic Mutual Ins. Co.,* 155 Wis.2d 808, 811, 456 N.W.2d 597, 598 (1990); *Folkman v. Quamme*, 2003 WI 116, ¶ 13, 264 Wis. 2d 617, 631, 665 N.W.2d 857, 864; *see also Taylor v. Greatway Ins. Co.*, 2001 WI 93, ¶ 10, 245 Wis. 2d 134, 141-42, 628 N.W.2d 916, 920.

Courts will interpret the words of an insurance contract against the insured when the insurer's interpretation conforms to what a reasonable person in the position of the insured would have understood the words to mean. *Folkman,* 264 Wis.2d 617 at ¶ 20 (citing *McPhee v. Am.*

4

*Motorists Ins. Co.,* 57 Wis.2d 669, 676, 205 N.W.2d 152 (1973)). In fact, even when the policy

is unambiguous, a coverage clause is broadly applied to afford coverage to the insured, *Tasker v.*

*Larson*, 149 Wis.2d 756, 760, 439 N.W.2d 159, 160 (Ct. App. 1989), and exclusions are applied

narrowly. *See Bartel v. Carey*, 127 Wis.2d 310, 214-215, 379 N.W.2d 864, 866 (Ct. App. 1985).

**III.    Christensen was an "insured" under WCMIC's Insurance Policy issued to Defendant Polk County with regards to the events identified in Plaintiff's Complaint.**

In relevant portions, under WCMIC's policy, an "insured" is defined as "your past or

present employees or elected or appointed officials while acting within the scope of their

employment or authority." (IPFF No. 56.) The question is whether Christensen was acting within

his scope of employment when he sexually assaulted Plaintiff. The appropriate answer is yes, he

was acting within his scope of employment and is an "insured" under WCMIC's insurance

policy.

### A.    *Scope of Employment must be defined broadly in the context of law enforcement.*

Case law is clear that an employee's conduct is within the scope of employment if "(a) it

is of the kind he is employed to perform; (b) it occurs substantially within the authorized time

and space limits; (c) it is actuated, at least in part, by a purpose to serve the master." Restatement

(Second) of Agency § 228 (1958); *Olson v. Connerly*, 156 Wis. 2d 488, 457 N.W.2d 479 (1990).

Employees act within the scope of their employment as long as they are "at a minimum,

'partially actuated by a purpose to serve the employer.'" *Fischer v. United States*, 996 F. Supp.

2d 724, 729 (W.D. Wis. 2014); (quoting *Block,* 201 Wis.2d at 806, 549 N.W.2d 783). "Serving

the employer need not be the sole purpose of the employee's conduct, nor need it be even the

primary purpose." *Id.*

Jailers can be acting within the scope of their employment even if they acted intentionally or criminally, and even if they misused their authority. *See Javier v. City of Milwaukee*, 670 F.3d 823, 829-30 (7th Cir. 2012); *Johnston v. Chi., St. Paul, Minneapolis & Omaha Ry. Co.*, 130 Wis. 492, 110 N.W. 424, 426 (1907) ("A master is liable for the tortious act of the servant done in the scope of his employment, though the master did not sanction it, or even though he forbade it."); Restatement (Third) of Agency § 7.07 cmt. c (2006) ("[C]onduct is not outside the scope of employment merely because an employee disregards the employer's instructions."); Restatement (Second) of Agency § 230 (1958) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment."); Restatement (Second) of Agency § 231 (1958) ("An act may be within the scope of employment although consciously criminal or tortious.").

Furthermore, the "wave of the future" is that "scope of employment" should be interpreted more broadly when an employee is a police officer. *Doe v. City of Chicago* v. 671 (7th Cir. 2004); (citing *Mary M. v. City of Los Angeles,* 54 Cal.3d 202, 285 Cal.Rptr. 99, 814 P.2d 1341, 1347–52 (1991) (since police officers are entrusted with enforcing the law they act with state authority, "inherent in this formidable power is the potential for abuse"… "the cost resulting from misuse of that power should be borne by the community, because of the substantial benefits that the community derives from the lawful exercise of police power")); *West v. Waymire,* 114 F.3d 646, 649 (7th Cir.1997) ("But when the employee is a male police officer whose employer has invested him with intimidating authority to deal in private with troubled teenaged girls, his taking advantage of the opportunity that authority and proximity and privacy give him to extract sexual favors from these girls should be sufficiently within the orbit of his employer-conferred powers to bring the doctrine of respondeat superior into play, even though he is not acting to further the employer's goals but instead on a frolic of his own" (internal

6

citations omitted)); *St. John v. United States,* 240 F.3d 671, 676–78 (8th Cir.2001); *Primeaux v.*

*United States,* 102 F.3d 1458 (8th Cir.1996); *Red Elk v. United States,* 62 F.3d 1102, 1104–07

(8th Cir.1995); *Ingram v. City of Indianapolis,* 759 N.E.2d 1144, 1146–48 (Ind.App.2001);

*Applewhite v. City of Baton Rouge,* 380 So.2d 119, 121–22 (La.App.1979); cf. *Stropes v.*

*Heritage House Childrens Ctr. of Shelbyville, Inc.,* 547 N.E.2d 244, 245, 249–50 (Ind.1989);

*Gutierrez v. Thorne,* 13 Conn.App. 493, 537 A.2d 527 (1988); see generally 1 J.D. Lee & Barry

A. Lindahl, *Modern Tort Law: Liability & Litigation* § 7:12 (rev. ed. 1994 & Supp.2001);

Rochelle Rubin Weber, Note, "'Scope of Employment' Redefined: Holding Employers

Vicariously Liable for Sexual Assaults Committed by Their Employees," 76 *Minn. L.Rev.* 1513

(1992).)

As the 7th Circuit so aptly stated in *Doe v. City of Chicago,*

It is not that being a police officer creates access that facilitates the commission of intentional torts. That is true of many employments. A meter reader gains access to homes by virtue of his employment by the electric company, but if he steals something from the home the theft is not deemed to be within the scope of his employment. See *Hendley v. Springhill Memorial Hospital,* 575 So.2d 547 (Ala.1990); *Grimes v. B.F. Saul Co.,* 47 F.2d 409 (D.C.Cir.1931). The difference between him and other intentional tortfeasors is slight. The situation of a police officer, however, is significantly different from that of a meter reader. The officer is armed, has authority to arrest that is considerably broader than the authority of a private person to make a "citizen's arrest," has access to all sorts of personal information, is an authority figure trained to develop and project an intimidating aura, and may seem to be above the law ("I am 911").

Indispensable to law and order, he is also and inescapably a dangerous instrumentality. A person who keeps a tiger in his backyard is strictly liable for the injuries caused by it, *G.J. Leasing Co. v. Union Elec. Co.,* 54 F.3d 379, 386 (7th Cir.1995), and when an independent contractor is hired to conduct an abnormally dangerous activity the principal is strictly liable for injuries caused by the activity. *Anderson v. Marathon Petroleum Co.,* 801 F.2d 936, 938–39 (7th Cir.1986); *Crane v. Conoco, Inc.,* 41 F.3d 547, 549–50 (9th Cir.1994); *Restatement (Second) of Torts* § 427A (1965). Maybe by analogy a police department should be held strictly liable for torts of police officers who use their official powers to commit the torts. As in the ultrahazardous-activity cases, the power of a rogue police officer to do harm is so great that more than ordinary care

on the part of his employer may be required in order to provide adequate
protection to the public.

*Doe v. City of Chicago*, 360 F.3d at 671.

Finally, because the scope-of employment issue involves question of intent and purpose,
generally it presents a question of fact. *Destolle v. Continental Case Co.*, 136 Wis.2d 13, 26-28,
400 N.W.2d 524, 528-29 (Ct. App. 1986). Even when the basic facts are undisputed, competing
inferences may often be drawn from the facts. *See Cameron v. City of Milwaukee*, 102 Wis.2d
448, 460, 307 N.W.2d 164, 170 (Ct. App. 1986).

Defendant Christensen admitted that he engaged in sexual conduct with Plaintiff although
he disputes the number of times and the type of conduct that he engaged in. (IPFF No. 26-33.)
Defendant Christensen was employed as a jailer for Defendant Polk County at all times
identified in Plaintiff's Complaint. (*Id.* at No. 2.) It was normal procedure to have only one
officer in the max pod, max control, which is where the sexual contact occurred. (PPFF No. 6-7.)
Defendant Christensen admitted that he would engage in the sexual contact when no other guards
were present. (IPFF No. 38; PPFF No. 8.) Defendant Christensen was the sole person in the max
pod, max control, when he initiated sexual contact with Plaintiff. (PPFF Nos. 5-8.)

Defendant Christensen's power as a jailer was signified in his physical appearance and in
his actions. Defendant Christensen wore a jail uniform, a badge, carried handcuffs, and wielded a
taser to indicate, physically, that he was in a position of authority. (*Id.* at Nos. 1-4.) Defendant
Christensen also had unfettered authority over inmates in his actions. Defendant Christensen
would call Plaintiff over the intercom when he wished to initiate sexual conduct. (*Id.* at No. 11.)
While Christensen was the lone person supervising the inmates, his complete control over
whether or not Plaintiff was able to shower; whether or not Plaintiff received food, whether or
not Plaintiff could receive a haircut; whether or not Plaintiff had access to a razor; whether or not

8

Plaintiff could have access to books and reading material; whether or not Plaintiff would receive medications; whether or not Plaintiff would receive clean sheets, towels, and a uniform; whether or not Plaintiff could use the multipurpose or X-room; whether or not Plaintiff could exercise according to the policies outlined in the inmate handbook; whether or not Plaintiff could access legal research; whether or not Plaintiff had access to materials on the supply cart;  whether or not Plaintiff would be placed in maximum security versus minimum security; whether or not Plaintiff could access playing cards; whether or not Plaintiff could hang personal items in her cell/bunk; whether or not Plaintiff would have access to the television and, how many channels she would be allowed to view, whether or not Plaintiff could have access to visiting family or friends, whether or not Plaintiff could access her bed and/or blankets throughout the day, whether or not Plaintiff would receive treats for "good behavior," and many other personal liberties that are often taken for granted while not incarcerated. (*Id.* at Nos. 13-32.) In addition, a lone jailer could, without any additional authority, impose punishment on an inmate for an alleged violation of jail policy. (*Id.* at Nos. 33, 34, 35, and 38.) This punishment could include random searches, lock down for 24 hours without a formal hearing, and a restriction of all of the privileges identified above. (*Id.* at Nos. 33, 34, 35, and 38.) The simple act of taking away television, playing cards, or access to the multipurpose room would have the ability of making an inmate's life miserable.

In combination with the power and authority that Defendant Christensen had, inmates are instructed via the inmate manual that they are to follow all orders of a jailer. (*Id.* at No. 13.) Failure to follow a direct order is a "major rule violation." (*Id.* at No. 37.) The punishment for a major rule violation can include segregation for more than 24 hours and loss of privileges up to 30 days (T.V., visits, etc.). (*Id.* at No. 38.) In addition, inmates are also informed that "[t]hose

[inmates] who cannot follow the rules will find their privileges and housing options restricted. You are responsible for your own behavior and you are ultimately responsible for the conditions of your stay at the Polk County Jail." (*Id*. at No. 43.) Thus, it is possible that no one else in the jail, other than the inmate, would have knowledge of immediate restrictions on privileges, just as Captain Nargis alleges that the administration did not have knowledge of Christensen's sexual conduct. (*Id*. at No. 9.) Defendant Christensen wielded tremendous power over the inmates and Plaintiff, specifically. It is this dynamic that is particularly troubling -- a tremendous amount of power, very little oversight, and the potential for a tremendous loss of life and liberty if improperly used.

Even under the traditional "scope of employment" framework, Defendant Christensen was acting within the scope of his employment. While Defendant Christensen was employed and during his work hours, he acted within his scope of employment to use the control that was so freely granted to him by Defendant Polk County to commit atrocious harms upon Plaintiff. The harms were actuated, in part, by a purpose to serve the master and as an exercise of the control that was so freely given to Polk County jailers.

However, even if the Court is not persuaded that Defendant Christensen acted to serve the master, the "scope of employment" analysis, as applied to a jailer, cannot be viewed as a typical employer-employee relationship. *See Doe v. City of Chicago*, 360 F.3d at 671. Defendant Christensen, often working alone, had complete control over every single move that an inmate made including providing for all basic needs. (PPFF Nos. 12-32.) The authority that he was granted had nearly no oversight and allowed him to make immediate decisions that no other person would have knowledge of. (*Id*. at Nos. 21, 30, 33, 34, 35, 36, 39.) Defendant Christensen was akin to a tiger in a person's back yard -- if you have an animal that is capable of immense

10

power and inflicting immense harm, you should be strictly liable for any acts committed by that animal. *Doe v. City of Chicago*, 360 F.3d at 671. It was this power that was granted to Defendant Christensen with no oversight that allowed him to engage in sexual contact with Plaintiff. Defendant Christensen was acting within his scope of employment when he engaged in sexual contact with Plaintiff.

### B.    The cases cited by WCMIC are not persuasive.

Two of the cases cited, *Meredith M. v. Pennsylvania General Ins. Co.*, and *S.J.A.J. v. First Things First, Ltd.*, are cited in violation of Wisconsin Statute § 809.23(3). *Meredith M. v. Pennsylvania General Ins. Co.*, 190 Wis. 2d 468, 528 N.W.2d 91 (Ct. App. 1994); *S.J.A.J. v. First Things First, Ltd.*, 200o WI App 233, 239 Wis. 2d 233, 619 N.W.2d 307). Both of the cases are unpublished, were issued prior to 2009, and do not fall into any specifically enumerated exception. In addition, *Meredith* is also per curiam. While both are distinguishable, this will not be explored as further citation is not appropriate.

*LLN v. Clauder* was cited for the proposition that "a priest who had sex with a woman who viewed him as her personal pastor acted outside the scope of his employment for purposes of imposing *respondeat superior* liability on his employer, because he was aware that using his office as a counselor to initiate the sexual relationship constituted conducted [sic] forbidden by his employer." (WCMIC Brief pg. 6.) The questions of respondeat superior and the scope of employment were not discussed with any length in the decision. *LLN v. Clauder*, 209 Wis. 2d 674, 563 N.W.2d 434 (1997). In fact, the term "scope of employment" was mentioned once and "respondeat superior" was mentioned twice. *Id.* The two issues in the case were 1) whether the First Amendment precluded the lawsuit of negligent supervision, and 2) whether, based on a prior incident with Clauder, the Diocese should have done additional investigation and could

have known that Clauder had a propensity to engage in inappropriate sexual conduct with vulnerable parishioners. *Id.* This case has no relevance or authority to the case at hand.

*Olson v. Connerly* was cited for the proposition that "the court held that a physician/therapist who had sex with a medical assistant was acting outside the scope of his employment for the purposes of indemnification." (WCMIC Br. 6.) This is simply not true. The **jury** determined that the physician was not acting within the scope of his employment when he ate lunch with a patient at local parks, engaged in an exercise program with the patient, and eventually went to the patient's house where sexual intercourse occurred. *Olson v. Connerly*, 156 Wis. 2d 488, 494, 457 N.W.2d 479, 481 (1990). Through a multitude of motions and appeals subsequent to the verdict, the jury's verdict was upheld. *Id.* at 494-501. WCMIC is not correct in their analysis; the jury decided the case based upon the facts, which was upheld on appeal. *Id.* This case is further distinguishable because, once again, there is no captor/captive dynamic present in *Olson* like there is in the matter at hand. The conduct by Christensen happened in a penal institution where Defendant Christensen called Plaintiff out of her cell and engaged in unconsented sexual contact. (PPFF No. 11.) The Polk County inmate handbook indicates that all inmates must comply with all orders of officials. (*Id.* at Nos. 13, 43.) As previously stated, Christensen, as a jailer, was solely responsible for providing food, allowing Plaintiff to shower, providing clean clothes to Plaintiff, etc. (*Id.* at Nos. 13-32.) With the great power given to Christensen, comes great risk. These basic liberties could be taken away at a whim. (*Id.* at Nos. 21, 30, 33, 34, 35, 36, 39.) This power, combined with the fact that inmates were required to comply with orders easily makes *Olson* distinguishable. It is easy to find that Defendant Christensen was acting within his scope of employment as a jailer when he used the power granted to him by Polk County to engage in unconsented sexual contact with Plaintiff.

*Doe v. St. Francis Sch. Dist.* involved a school teacher having inappropriate relations with a student that occurred after school hours, off of the school campus, and in the teacher's private residence. *Doe v. St. Francis Sch. Dist.*, 834 F. Supp. 2d 889, 892 (E.D. Wis. 2011), aff'd, 694 F.3d 869 (7th Cir. 2012). It can easily be seen how the teacher was acting outside of her scope of employment when none of the actions occurred on the school campus or during regular employment hours. Again, the captor/captive dynamic is not present such that the matter at hand is distinguishable.

*Block v. Gomez* involved a doctor/patient relationship that started as counseling and resulted in a sexual relationship that lasted eight months. 201 Wis. 2d 795, 799-800, 549 N.W.2d 783, 785 (Ct. App. 1996). The doctor took the patient and her daughter on a fishing trip and eventually moved into and lived in the patient's apartment where sexual relations would occur. *Id.* at 800. The district court held that, as a matter of law, the doctor was acting outside his scope of employment. *Id.* at 804. Again, there was no captor/captive relationship -- the doctor moved into the patient's apartment. It is, once again, easy to see how this was deemed outside the scope of employment and how this case is distinguishable.

*Doe v. Time Warner Cable of SE Wisconsin, L.P.*  held that, as a matter of law, a woman who was sexually assaulted by a co-worker who was walking her to her car after a work meeting. No. 07-C-781, 2007 WL 4143226 (E.D. Wis. Nov. 19, 2007). They were outside of work hours, not engaging in work and, other than being co-employees, had no other ties to being in the "scope of employment." *Id. S.V. v. Kratz* held that a district attorney who solicited a sexual relationship with a victim of a crime was outside of his scope of employment. No. 10-C-0919, 2012 WL 5833185, at *7 (E.D. Wis. Nov. 16, 2012). Again both of these cases are easily distinguishable. Christensen was a captor over Plaintiff, the captive. Christensen was at work,

13

using the scope of power that he was granted by the Defendant Sheriff to engage in unconsented sexual contact with Plaintiff.

Christensen was acting within his scope of employment such that he is an "insured" under WCMIC's insurance policy issued to Polk County. At the very least, the determination involves the question of intent and purposes, such that there is a factual dispute which renders summary judgment inappropriate. As stated by *Cameron v. City of Milwaukee*, even if the basic facts are undisputed, competing inferences may often be drawn from those facts. 102 Wis.2d at 460. A reasonable jury could determine that Defendant Christensen was acting within the scope of employment based on the undisputed facts and the immense power held by Defendant Christensen. (PPFF Nos. 13-44.) As such, summary judgment is not appropriate.

**C.     The "bodily injury" exclusion does not preclude coverage to Defendant Christensen.**

WCMIC claims that the "bodily injury" precludes insurance coverage. (WCMIC Br. 10.) This is simply untrue. The bodily injury exclusion states that there is no coverage afforded to any, "bodily injury... expected or intended from the standpoint of the insured." (IPFF No. 59.) Bodily injury is defined as: "bodily injury, sickness, disability or disease, sustained by a person during the policy period, including death resulting from any of these at any time." (*Id.* at No. 57.)

According to the terms in WCMIC's policy, the harms alleged in Plaintiff's Complaint are not bodily injury harms, but "personal injury" harms. Personal injury is defined in WCMIC's policy as, "injury, other than bodily injury, during the policy period arising out of one or more of the following offenses: ... 6. Assault and battery, including *sexual molestation*." (*Id.* at No. 57.) Sexual molestation is defined as "the actual or attempted or alleged sexual contact of a person or more than one person's acting in concert." (PPFF No. 44.) Christensen readily admits that he engaged in sexual contact with the Plaintiff. (IPFF 26-30.) The reading of this language by a

14

reasonable person in the position of the insured would be that the conduct by Christensen

resulted in "personal injury" and not "bodily injury" as they are defined in WCMIC's insurance

policy. Thus, the bodily exclusion does not apply so as to prohibit coverage to Defendant

Christensen.

### D.   Neither the "willful violation of a penal code" nor the "deliberately wrongful conduct" exclusions preclude coverage to Defendant Christensen.

WCMIC's insurance policy is ambiguous in that it both provides coverage for and

excludes coverage for acts of sexual contact. The WCMIC policy expressly covers personal

injury. (IPFF No. 55.) The policy defines "personal injury" coverage to include "Assault and

battery, including sexual molestation." (*Id.* at No. 57.) "Sexual molestation" is defined as "actual

attempted or alleged sexual contact of a person or more than one persons acting in concert."

(PPFF 44.) The penal statute exclusion, however, states no coverage exists where there is a

willful violation of a penal statute. (IPFF Nos. 60-61.) The deliberately wrongful conduct

provision, when read in combination with the definition of "errors and omissions" reads as

follows:

> This policy does not apply to any misstatement or misleading statement or act or
> omission or neglect or breach of duty during the policy period, including
> misfeasance, malfeasance and nonfeasance by an insured in their capacity as such
> resulting in or arising from any deliberately wrongful act...

(*Id.* at Nos. 58, 61.) By its nature, sexual molestation is a deliberately wrongful act. These

dueling definitions lead to the inevitable question: is an act of sexual contact ever covered under

the WCMIC policy?

WCMIC's policy was drafted to provide coverage for sexual molestation/contact, but that

same coverage is seemingly taken away by both the penal statute exclusion and the deliberately

wrongful act exclusion, rendering the grant of coverage illusory and ambiguous. A policy is

illusory when it defines coverage in such a manner that coverage will never actually be triggered.

*Allstate Ins. Co. v. Gifford*, 178 Wis. 2d 341, 349, 504 N.W.2d 370, 373 (Ct. App. 1993). Where a policy provides illusory "coverage," it may be reformed to conform to the insured's reasonable expectations of coverage. *Id; Continental Western Ins. Co. v. Paul Reid, LLP, GPS, Inc.*, 2006 WI App. 89, ¶7, 292 Wis.2d 674, 679, 715 N.W. 2d 689, 691 (internal citation omitted). Policy language is "ambiguous if it is reasonably or fairly susceptible to more than one interpretation." *Id.* at ¶ 7 (internal citation omitted). Courts construe ambiguous language in favor of coverage. *Id.* (internal citation omitted).

Furthermore, the WCMIC policy presents an issue of contextual ambiguity. In resolving this issue, the test for determining whether contextual ambiguity exists is the same as the test for ambiguity in any disputed term of a policy. *Folkman v. Quamme*, 264 Wis.2d 617 at ¶ 29. Specifically, are the words or phrases of an insurance contract, when read in the context of the policy's other language, reasonably or fairly susceptible to more than one construction? *Id.* The standard for determining a reasonable and fair construction is measured by the objective understanding of an ordinary insured. *Id.* (internal citation omitted). In a similar case, *L.L. v. Medical Protective Company*, the court addressed whether violation of a criminal sexual conduct statute mandates application of a policy exclusion for acts committed in the performance of a criminal act. 122 Wis. 2d 455, 362 N.W.2d 174 (Ct. App. 1984). The *L.L.* court held that the exclusion did not preclude coverage, noting: "The insurance policy does not clearly indicate whether it is meant to cover acts by the insured psychiatrist which constitute or are evidence of malpractice but which also are defined as criminal. Where the meaning of an insurance policy is unclear, it must be construed against the insurer and in favor of coverage." 122 Wis.2d at 464 (citing *Katzke v. Randolph & Scott Mutual Fire Insurance Co.*, 116 Wis.2d 206, 213, 341

N.W.2d 689, 692 (1984)). Thus, despite the penal code violation exclusion, the court found coverage existed because the policy was unclear and ambiguous.

WCMIC has built into its policy just enough room to continue to deny coverage such that the coverage arguably will never trigger at all. The insurance policy must be interpreted from a reasonable person receiving the policy. *Folkman,* 264 Wis.2d 617 at ¶ 20. The ambiguity within the policy must be construed in favor of the insured. *Id.* As such, neither the penal exclusion nor the deliberately wrongful act exclusion precludes coverage to Defendant Christensen.

Finally, even if exclusions do apply, there is a factual dispute as to both of the exclusions. First, the violation of the penal statute must be "willful" or "intentional" to fall under the penal acts exclusion. (IPFF Nos. 60, 61). Second, the wrongful act must be "deliberate" to fall under the deliberate acts exclusion. (*Id.* at 61). Defendant Christensen was asked in his deposition the following series of questions:

> Q: You know they couldn't legally consent, true?
> A: No.
> Q: You didn't know that?
> A: No.

(PPFF 10.)

Christensen was later asked the following questions:

> Q: Were you ever told by or trained on the fact that inmates cannot give consent to sexual activity to a jailer?
> A: Not that I'm aware of, no.
> Q: You don't recall ever receiving any training from Polk County that said … that an inmate could not consent to sex with a jailer?
> A: Correct.

(*Id.*) As such, a factual issue exists as to whether or not Christensen **intentionally** violated the penal code and whether or not he committed a **deliberately** wrongful act, as is suggested by WCMIC. Again, the standard is that all facts along with reasonable inferences must be construed

in the light most favorable to the nonmoving party. *Simpson*, 171 F.3d at 551. If a fact finder concludes that Christensen thought that an inmate could consent, they could find that he did not commit a deliberately wrongful act. As such, summary judgment is not appropriate.

## CONCLUSION

Based upon the foregoing facts and law, Defendant WCMIC is not entitled to summary judgment as a matter of law. They have failed in their burden of proof to establish a right to summary judgment. Their motion should be denied in its entirety, and this matter allowed to proceed to trial.

**ECKBERG LAMMERS, P.C.**

Dated:   8th day of July, 2016 _____        By:   s/Lida M. Bannink_____
                                        Thomas J. Weidner (1082013)
                                        Lida M. Bannink (1088518)
                                        Attorneys for Plaintiff
                                        430 Second Street
                                        (715) 386-3733
                                        tweidner@eckberglammers.com
                                        lbannink@eckberglammers.com

18