**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

J.K.J.,

        Plaintiff,                Civil Action No. 15-cv-428-wmc

v.

POLK COUNTY AND
DARRYL L. CHRISTENSEN,

        Defendants,

and

WISCONSIN COUNTY MUTUAL INSURANCE
CORPORATION,

        Intervenor.

M.J.J.,

        Plaintiff,                Civil Action No. 15-cv-433-wmc

v.

POLK COUNTY AND
DARRYL L. CHRISTENSEN,

        Defendants,

and

WISCONSIN COUNTY MUTUAL INSURANCE
 CORPORATION,

        Intervenor.

**PLAINTIFF'S PROPOSED FINDINGS OF FACT**

NOW COME Plaintiffs, M.J.J. and J.K.J., by their undersigned attorneys and submit the

following Proposed Findings of Fact in support of their Response to Defendant Polk County's

Motion for Summary Judgment in both Case No. 15-C-428 and Case No. 15-C-433.

## A.  Jail Administration

1.    Christensen was employed as a jailer for Defendant Polk County at all times identified in Plaintiffs' Complaint. (Case No. 15-c-433, ECF No. 46 at 6:17-22; Case No. 15-c-428, ECF No. 47 at 6:17-22.)

2.    Captain Scott A. Nargis ("Nargis") has been Polk County Jail Captain since 2010. From April 2008 to November 2010 Nargis was acting as Jail Administrator (Case No. 15-c-433, ECF No. 49 at 5:7-20; Case No. 15-c-428, ECF No. 48 at 5:7-20.)

3.    Sheriff Peter Johnson ("Johnson") is the current Polk County Sheriff and has been since 2011. (Case No. 15-c-433, ECF No. 53 at 5:5-9; Case No. 15-c-428, ECF No. 52 at 5:5-9.)

4.    Steven Moe ("Moe") was the Polk County Chief Deputy from 1991 until he retired in March 2016. (Case No. 15-c-433, ECF No. 59 at 8:12-14; Case No. 15-c-428, ECF No. 58 at 8:12-14.)

5.    Defendant Christensen wore a uniform while employed as a jailer at the Polk County Jail. (Affidavit of Lida Bannink July 29, 2016 ("Bannink Aff.") Exs. K, N, O, P, Q, R, S.)

6.    Defendant Christensen carried handcuffs while employed as a jailer at the Polk County Jail. (*Id.*)

7.    Defendant Christensen wore a badge while employed as a jailer at the Polk County Jail. (Bannink Aff. Ex. K.)

8.    Defendant Christensen was trained in, and carried a taser while employed as a jailer at the Polk County Jail. (Bannink Aff. Ex. T.)

9.    Defendant Christensen would use the intercom to call Plaintiff out of the pod to engage in sexual contact. (Case No. 15-c-433 ECF No. 48 at 64:1-15, 84:23-25 and 86:5-10; Case No. 15-c-428 ECF No. 46 at 57:21-23 and 58:20-59:8.)

10.   Defendant Christensen, often working alone, had complete control over every single move that in inmate made including providing for all basic needs. (Bannink Aff. Exs. J, K, L, M.)

11.   The Polk County inmate handbook indicates that all inmates must comply with all orders of jailers. (*Id*. at Ex. K pg. 4.)

12.   Inmates that are not given Huber privileges are not allowed under the sheets or blankets of their bed during the day. (*Id*. at pg. 2.)

13.   Inmates are informed that they are to shower daily from 0700 to 1000 hrs. (*Id*.)

14.   If inmates are to request a razor for shaving they must do so during 0700 meds and they must be requested personally. (*Id*.)

15.   Medications are administered four times daily by jailers whereby the inmate must come to the door for their medications. (*Id*. at pg. 3.)

16.   Uniforms and towels are exchanged twice weekly, sheets are exchanged weekly, and blankets are exchanged monthly. (*Id*.)

17.   Inmates can receive items from the supply cart only if not otherwise available through commissary and only on Monday and Thursday. (*Id*.)

18.   Inmates are allowed to exercise without their shirt for 60 consecutive minutes per day. (*Id*.)

19.   Recreation privileges, such as exercising, may be denied to inmates by staff. (*Id*. at Ex. M.)

20.     Playing cards are available through commissary. (*Id*.)

21.     Polk County Jail staff are solely responsible for providing meal trays to inmates. Inmates

        failing to come to the pass through during meal pass may miss the meal. (Bannink Aff.

        Ex. K at pg. 4.)

22.     In order to get a haircut, an inmate must request use of jail owned clippers which are

        available one time per month. Jailers have the authority to stop use privileges

        indefinitely. (*Id*. at pg. 9.)

23.     Inmates are charged a $5.00 co-pay to see the jail nurse. (*Id*. at pg. 3.)

24.     Inmates cannot change bunks or move to another cell without an officer's approval in

        medium and maximum pods. (*Id*. at pg. 2.)

25.     Inmates cannot hang any personal items in the inmate's cell or on their bunk (*Id*.)

26.     In order to receive new books and reading materials, an inmate must request them from

        Jail officers through the jail library or submit a request through jail staff for books from

        an outside agency.  (Bannink Aff. Ex. L.)

27.     In order to do legal research, other than through an attorney, an inmate must fill out an

        Inmate Request Form and submit it to an officer in order to receive those materials. (*Id*.)

28.     Televisions can be restricted for disciplinary reasons. (*Id*. at Ex. M.)

29.     According to Polk County Jail Policy, the multipurpose room, or X room, was only

        available for inmates for use upon requesting permission from the jailer on duty (*Id*.)

30.     The multipurpose, or X-room could be used for walking, calisthenics, aerobic exercise,

        shadow boxing, etc. (*Id*.)

31.     The captain of the Polk County Jail allowed inmates to be given treats for good behavior.

        (Case No. 15-c-433, ECF No. 46 at 121:16-122:9; Case No. 15-c-428, ECF No. 47 at

121:16-122:9.)

32. An inmate's person, property, and cell/pod could be searched at random and an inmate has no right to be present during the search. (Bannink Aff. Ex. K, pg. 4.)

33. Officers could restrict privileges and/or lock down an inmate for up to 24 hours without a formal hearing for violations of the jail rules. (*Id.*)

34. Jailers could determine that a major rule violation be punished with a sanction normally reserved for a minor rule offense. (*Id.*)

35. Disobeying a direct order is considered a "major rule violation." (*Id.* at pg. 6.)

36. Penalties for a major rule violation can include:

      i. Disciplinary segregation for a period greater than 24 hours.
      ii. Loss of one or more privileges for up to 30 days (T.V. visits etc)
     iii. Loss of Canteen- except hygiene and writing materials
     iv. Restitution for damages
      v. Criminal Charges
     vi. Re-classification
    vii. Loss of good time
   viii. Request to court for revocation of Huber Privileges
     ix. Any combination of the above

(*Id.*)

37. Penalties for a minor rule violation are as follows: "An officer witnessing or gaining knowledge of an incident involving violations of minor jail rules may **immediately** discipline the offending inmates by: verbal warning, temporarily restricting that inmate's privileges (T.V., canteen, etc.), placing the inmate on Disciplinary Segregation for 24 hours, Restitution for damages, and write up for re-classification.  (*Id.* at pg. 7) (emphasis added.)

38. Minimum Security inmates "will be given some additional privileges not afforded medium or maximum inmates. These include the ability to have 2 visits per week and full access to current and future jail programs. 2 late nights will be offered per week.

Additional TV channels are also provided." (*Id*. at pg. 11.)

39. Medium Security Inmates "will also be allowed 2 visits per week and somewhat limited access to jail programs. One late night per week based on inmate behavior and officer discretion. Housing will be in a separate part of the jail from minimum inmates. Limited TV channels are provided." (*Id*.)

40. Maximum Security Inmates "will also be offered one visit per week. You will not be allowed to attend group programs, only the Friday morning One on One. 5 TV channels are provided. Maximum Security inmates will be housed separately from all other inmates." (*Id*.)

41. Inmates are informed that, "[t]hose [inmates] who cannot follow the rules will find their privileges and housing options restricted. You are responsible for your own behavior and you are ultimately responsible for the conditions of your stay at the Polk County Jail." (*Id*.)

### B. Polk County's policy makers for training and jail policy

42. Prior to becoming a Sheriff, Sheriff Johnson did not have training in jail operations, since becoming sheriff his training has been "very limited." (Case No. 15-c-433, ECF No. 53 at 7:4-20; Case No. 15-c-428, ECF No. 52 at 7:4-20.)

43. Sheriff Johnson does not handle the "minutia" of running a jail which includes training unless issues are brought to his attention. (*Id*. at 8:11-9:3;  *Id*. at 8:11-9:3.)

44. Nargis would only discuss the content of the training with Sheriff Johnson if the issued involved a budgetary change. (*Id*. at 16:16-22, 17:16-21; *Id.* at 16:16-22, 17:16-21.)

45. Sheriff Johnson indicated that Captain Nargis reported directly to Chief Deputy Steve

Moe ("C.D. Moe"), who was Chief Deputy for all relevant time periods until March of

2016, when he retired. ( *Id*. at 11:1-10; *Id*. at 11:1-10.)

46.    C.D. Moe indicated that the jail administrator/jail captain was responsible for training jail

staff. (Case No. 15-c-433, ECF No. 59 at 14:20-23, 15:4-9; Case No. 15-c-428, ECF No.

58 at 14:20-23, 15:4-9.)

47.    If there were discussions regarding the context or quality of training between C.D. Moe

and the jail administrator/captain was done in passing.  (*Id*. at 26:6-16;  *Id*. at 26:6-16.)

48.    Nargis created the training program for all time periods relevant to Plaintiffs' complaints

(Case No. 15-c-433, ECF No. 49 at 18:3-9; Case No. 15-c-428, ECF No. 48 at 18:3-9.)

49.    Inspector Brad Hompe has never had any conversations regarding policy decisions or

sent his inspection reports to any of the County Commissioners, these conversations and

documents are always sent to Sheriff Johnson and Captain Nargis. (Case No. 15-c-433,

ECF No. 73 at 49:11-18; Case No. 15-c-428, ECF No. 72 at 49:11-18.)


**C.  Polk County's knowledge of PREA**

50.    Mr. Hompe was employed through the Wisconsin Department of Corrections ("DOC").

(Case No. 15-c-433, ECF No. 73 at 4:23-5:4, 10:2-2; Case No. 15-c-428, ECF No. 72 at

4:23-5:4, 10:2-2.)

51.    Although Brad Hompe does not consider himself a PREA expert he has provided

numerous resources to the jails that he inspects, including Polk County, on how to

comply with the law. (*Id*. at 41:17-22; *Id*. at 41:17-22.)

52.    In fact, he has told everyone in his jail administrative group "not to ignore PREA." (*Id*. at

43:14-15; *Id*. at 43:14-15.)

53. As PREA was created, there were "a lot of questions and frustration about [PREA] as it rolled out. When it first came out people didn't necessarily understand what to do, where to go." (*Id*. at 41:23-42:6; *Id*. at 41:23-42:6.)

54. In Brad Hompe's role as a detention facility specialist, he provided those administrators with resources that they could use. (*Id*. at 42:7-16; *Id*. at 42:7-16.)

55. The DOC provides resources regarding PREA to local jails, but they have no means of enforcing compliance. (*Id*. at 16:1-4, 17:2-18:7; *Id*. at 16:1-4, 17:2-18:7.)

56. Hompe provides the following resources to jails that he administers: Those resources were made available to us. I believe it was a technical assistance grant the state got. And we gave the jails, if they wanted them, there were posters that they could post in their jails, zero tolerance for sexual abuse. We developed a training PowerPoint for PREA, and I don't recall all of the components, but one of the components was staff training that they could utilize if they choose to do so. (*Id*. at 18:8-19; *Id*. at 18:8-19.)

57. The National Institute of Corrections ("NIC") also provides PREA resources to county jails. (*Id*. at 13:3-9, 13:7-14:4; *Id*. at 13:3-9, 13:7-14:4.)

58. If Polk County had requested resources, they were made well aware of the fact that resources could be found online. (*Id*. at 19:5-15; *Id*. at 19:5-15.)

59. The DOC has sent several emails on the topic of PREA to jail administrators since it became an act. (*Id*. at 29:24-30:22; *Id*. at 29:24-30:22.)

60. Additional resources that have been made available to local jails include a PREA investigator training in Chippewa County, as well as online PREA training through Edcor, an online training that walks through PREA 101 with a recorded quiz upon completion. (*Id*. at 39:19-40:7, 41:2-7; *Id*. at 39:19-40:7, 41:2-7.)

61. Sheriff Johnson admitted that other than the basic concepts, he does not have any knowledge about PREA. (Case No. 15-c-433, ECF No. 53 at 17:23-18:7, 19:10-19; Case No. 15-c-428, ECF No. 52 at 17:23-18:7, 19:10-19.)

62. When asked "what things would you like to get to" the response was "[a]nd again, I don't know the details. Certain things, I know you have to have an officer that is the PREA compliance officer that takes those complaints and forwards them where they need to go. You know, there's a policy that has to be in place." (*Id.* at 19:20-20:1; *Id.* at 19:20-20:1.)

63. Sheriff Johnson believes that Captain Nargis is working on PREA compliance although they have not had discussions other than that Polk County needs to get as much in compliance as possible. (*Id.* at 20:11-13, 20:14-20; *Id.* at 20:11-13, 20:14-20.)

64. Sheriff Johnson assumes that Captain Nargis is the PREA compliance officer. (*Id.* at 21:22-23; *Id.* at 21:22-23.)

65. The sheriff believes that PREA policies are currently in place although he does not know what the policies are and that Nargis would know. When asked whether PREA policies were in place, the sheriff indicated, "I believe they are, my understanding is that they are." (*Id.* at 21:1-11, 21:8-16, 21:22-23; *Id.* at 21:1-11, 21:8-16, 21:22-23.)

66. Sheriff Johnson does not know what is required by PREA to be provided to inmates, Captain Nargis would know that information, but he believes that Polk County is compliant. (*Id.* at 22:16-23:14; *Id.* at 22:16-23:7.)

67. C. D. Moe does not have any special training on PREA and beyond the purpose of eliminating assaults from prisons, he does not have additional information and has never read PREA. When asked if he had any special training on PREA, C.D. Moe indicated, "I don't believe so." (Case No. 15-c-433, ECF No. 59 at 34:16-35:1, 35:20-24, 36:13-18,

36:19-20; Case No. 15-c-428, ECF No. 58 at 34:16-35:1, 35:20-24, 36:13-18, 36:19-20.)

**D.  Prior allegations of sexual assault at Polk County Jail**

68.    An inmate at the jail indicated that Officer Christensen entered the cell block to remove

cleaning supplies while she was in the shower alleging that he attempted to look at her

naked; Christensen admitted he entered the cell block but did not get close to the shower.

(Bannink Aff. Ex. G, PCJ 3727.)

69.    Captain Nargis informed the inmate that "I did say that Officer Christensen is a veteran

officer and that I am not aware of any accusation such as this in the past, and that I have

no reason to believe he would engage in that sort of behavior." (*Id*. at 3728.)

70.    The inmate further alleged that Christensen made comments about her "having a nice

butt" and also "with someone as good-looking as you in here we have to look." (*Id*. at

3728.)

71.    When approached on the incident, Christensen indicated he is not sure why the inmate

would make false statements as he was nice to her, offered her fresh cups of coffee at

time and once gave her a doughnut. (*Id*. at 3728-3729.)

72.    Captain Nargis "instructed Officer Christensen that it would be in his best interests to

avoid entering B-pod unless he absolutely needed to." (*Id*. at 3729.)

73.    Captain Nargis' report indicates he is waiting for more information from another officer,

but there is nothing in the documentation provided that would show that additional follow

up was completed. (Bannink Aff., Ex. G, PCJ 3729; Case No. 15-c-433, ECF No. 49 at

57:14-58:9; Case No. 15-c-428, ECF No. 48 at 57:14-58:9.)

74.    Jailer Alan Jorgensen was accused of having sexual contact/language with an inmate at

the Polk County Jail in January of 2012. (Bannink Aff. Ex. D, PCJ 3739, 3741-3746.)

75.    In addition, multiple of the female officers made sexual harassment claims and one
coworker indicated that Jorgensen spent time "leering" at female inmates. (*Id*. at 3739,
3762-3767.)

76.    C.D. Moe and Nargis met with Officer Jorgensen. (*Id*. at 3745.)

77.    Captain Nargis informed Jorgensen that "there were two things that consistently came up
[from the investigation]: there is a perception by the other inmates of the K-pod that there
is some kind of relationship between him & [NS] and that he gives her undue and/or
preferential treatment, and that he spends an inordinate amount of time in contact with
her when compared with other inmates." (*Id*. at 3746.)

78.    Jorgensen did not offer an explanation as to why multiple inmates would make these
allegations other than that one of the inmates had an infatuation with him, he denied any
inappropriate relationship (*Id*.)

79.    C.D. Moe informed Officer Jorgensen that there were some potentially serious
consequences involved with this situation, but that he "did not feel that Officer
Jorgensen's job was in jeopardy." (*Id*. at 3746-3748.)

80.    Captain Nargis believed that, at best, Jorgensen allowed some kind of relationship to
grow between Jorgensen and the inmate (*Id*. at 3747.)

81.    Captain Nargis "advised him [Jorgensen] that we valued his contribution to the
department, that we know he is a "go to" guy when we need help with something. He was
informed that we had considered his work history and the fact that there was no prior
discipline history. C.D. Moe then advised him that I would be preparing a letter of
reprimand this week We tried to assure Officer Jorgensen that a letter in his file is not a

11

major deal, that it should be a learning experience. We thanked Officer Jorgensen for

taking the time to meet with us, shook hands, and concluded our meeting. In accordance

with our decision, I will be preparing a letter of reprimand for Officer Jorgensen's file."

(*Id*.)

82.     After a letter was received from the alleged victim of sexual assault and another letter

intercepted from the same alleged victim to a prior inmate, Polk County completed more

investigation and determined

> [Allen] was being warned that any other allegations of a similar nature
> involving inmates would probably result in some suspension time while it
> was investigated. I informed him I believed that he was being less than
> honest with us, and that was based on by training & experience as an
> interrogator. I informed him that the information was too similar to be
> coincidental, and that there were some things that the inmate could *not*
> have known unless he told her. [Referencing Jorgensen trying to have a
> threesome with a girl from Peru]…
>
> Even if there was no touching, his behavior was inappropriate and
> unprofessional. C.D. Moe did mention that what he was wanting to hear
> from Officer Jorgensen was some kind of statement indicating that he
> knew what behavior was proper and what was not. Sheriff Johnson also
> spoke of keeping the line between personal and professional life, and not
> crossing it. Officer Jorgensen **never did provide acknowledgement of an
> inappropriate relationship, or a statement that he understood what
> was proper and what was not.**
>
> **I advised officer Jorgensen that the letter of reprimand he received
> last week was the end of the issue at this** point. … I feel compelled to
> note that, based on my training & experience, and based on knowing
> Officer Jorgensen for 9-plus years, it is my opinion that he was not only
> less than honest about this, **but he was outright lying to us at times**. No
> further information at this time.

(*Id*. at 3751.)

83.     After five female jailers indicated that Jorgensen targeted inappropriate sexual comments

towards them. Nargis wrote:

> Officer Jorgensen was advised that any further complaints by co-workers
> would be closely scrutinized. He was reminded to keep his conversation

professional. He was told that the Department would **not be taking any action on the allegations at this time**, other than reporting it to E.R. [presumably employee relations] and that they would be following up.

I feel compelled to note that based on my training & experience, and having known Officer Jorgensen for 9-plus years, **it is my opinion that he was less than honest with us, and at times was outright lying to us.**

(*Id*. at 3762-3767.)

84.  There were no additional documents provided from discovery with regards to this matter despite the documents being requested. (*Id*. at 3737-3768; Bannink Aff. Ex. A-D.)

85.  Sheriff Johnson does know if they "had come to a final discipline or if he resigned prior to that." (Case No. 15-c-433, ECF No. 53 at 30:14-18; Case No. 15-c-428, ECF No. 52 at 30:14-18.) Although, it is known that when Christensen resigned Polk County terminated their investigation because he was no longer an employee (*Id*. at 25:24-25:4; *Id*. at 25:24-25:4) and that Jorgensen resigned shortly after being prompted with the allegations. (*Id*. at 30:5-9; *Id*. at 30:5-9.)

### E.  Notice that male guards were uncomfortable supervising female inmates

86.  Christensen was uncomfortable supervising female inmates. (Case No. 15-c-433, ECF No. 46 at 111:1-3; Case No. 15-c-428, ECF No. 47 at 111:1-3.)

87.  Christensen's concern was, "voiced by several of us throughout my career that we felt that it should be separated." (*Id*. at 111:4-8; *Id*. at 111:4-8.)

88.  Although Christensen did not personally tell them why he was uncomfortable, he knew that others voiced their opinion that, "because of this fact that you can see—when they don't put towels over there, you can see into the showers. They come out of the shower and go into their rooms, and they've got to get dressed. You're looking directly into the cell blocks. You can see everything." ( *Id*. at 111:14-22; *Id*. at 111:14-22.)

89. Christensen indicated that he could not handle the pressure. ( *Id*.at 111:23-25; *Id*. at 111:23-25.)

## F.  Rule violations in Polk County

90. On September 29, 2014 a coworker made a complaint that she could smell a "strong odor of intoxicants" coming from Christensen and that he "appeared hungover and made references to being hungover." (Bannink Aff. Ex. G, PCJ 3718.)

91. C.D. Moe expressed his concern to Captain Nargis that this incident was "yet another 'negative' contact with Officer Christensen in a short period of time" and Captain Nargis indicated that "it doesn't do any harm for him to know that he cannot behave in any way he chooses." No formal punishment or training was given. (*Id*. at 3719.)

92. On June 20, 2014 Captain Nargis saw Christensen on his cell phone with his back to an inmate while the inmate was on a phone for inmates. Once Christensen heard the booking room door close, Christensen hung up his phone. A short time later Christensen was then in the inmate property storage room, again on his phone. (*Id*. at 3720.)

93. Captain Nargis, "expressed [his] exasperation and reminded [Christensen] that cell phones can be accessed in the break room, and that they do not belong in the jail. [He] stated that it is bad enough that [he has] caught people in Max and Master, but on the floor with an inmate out—and his back to the inmate—was not acceptable" and this " was certainly not the type of example our most-senior officer should be making… [he] thanked him for his time and excused him to go off duty." No other punishment or training was issued as a result. (*Id*.)

94. On July 27, 2010, Captain Nargis found that Christensen was solely in charge of the maximum area, did not delegate his duties back to master, and left the post to go meet his

wife and pick up his lunch which was against policy and "particularly disturbing" as Christensen was their Safety and Security Officer. (*Id*. at 3730-3731.)

95.   On April 22, 2011, there was an allegation that Christensen used unnecessary and excessive force against an inmate (MW). (Case No. 15-c-433, ECF No. 49 at 58:21-59:12; Case No. 15-c-428, ECF No. 48 at 58:21-59:12; Bannink Aff., Ex. E, PCJ 3725-3726.)

96.   Captain Nargis concluded, "Given all of the information… it is my opinion that the use of force in this incident was not necessary… nor was the amount of force reasonable... [g]iven that, I will be proceeding with the discipline process as the result of an excessive use of force." (Bannink Aff., Ex. G., PCJ 3734.)

97.   Captain Nargis summarized his investigation as follows:

> I believed that this matter was best resolved by issuing a verbal reprimand to Officer Christensen, and providing re-training on the justification for use of force in the Jail, per our policy.
>
> I would like to note that officer Christensen has a lengthy history of service with our Department and has had no similar incidents in the past.

(*Id*. at 3726.)

98.   Captain Nargis believed that Christensen had taken this matter seriously, that he was remorseful, and that he was sincere in changing his ways. (Case No. 15-c-433, ECF No. 49 at 61:1-62:3; Case No. 15-c-428, ECF No. 48 at 61:1-62:3.)

99.   When Christensen was asked in his October 6, 2011 Performance Review what was his "favorite incident/event in the past 12 months and why? What made it so special"

Christensen indicated, "[MW] incident- felt good."When asked "what was your biggest mistake/regret of the past 12 months and what did you learn from it? Christensen wrote "[MW] incident- got disciplined." Captain Nargis signed Christensen's, October 6, 2011, performance review. (Bannink Aff., Ex. F.)

100.   On May 25, 2009, the Polk County Jail received a call from an angry inmate who indicated that Christensen attempted to pit a co-defendant against him by disclosing statements relating to his criminal case.  Captain Nargis said to the inmate that he "had no reason to believe that officer (Darryl Christensen), who is a veteran officer with no issues such as this on his record, would engage in any inappropriate behavior." (*Id*.)

101.   Christensen denied that he engaged in such conduct and Captain Nargis indicated, "that it appeared to be what I had suspected, a case of misinformation, and I wanted him to be aware of the situation just in case something should arise. I thanked him and continued with my duties." (Bannink Aff., Ex. G, PCJ 3721.)

102.   During the Jorgensen investigation, other Polk County jailers, including Christensen, heard rumors that Jorgensen was having "inappropriate sexual relations" with female inmates. (Case No. 15-c-433, ECF No. 46 at 137:5-15; Case No. 15-c-428, ECF No. 47 at 137:5-15.)

103.   Christensen did not feel the need to tell supervisors because "they're rumors… I'm not going to go and report to my captain that – if I didn't see it happen, there's nothing to report. (*Id*. at 137:21-138:12;  *Id*. at 137:21-138:12.)

104.   The only time Christensen would tell a supervisor is "if [he] witnessed it." ( *Id*. at 138:5-22; *Id*. at 138:5-22.)

### G.  Polk County's failure to train officers on PREA

105.    Jorgensen was engaging in inappropriate relationships prior to Christensen beginning to do so. (*Id*. at 138:2-4; *Id*. at 138:2-4.)

106.    The only training Defendant Christensen had regarding the concept of correctional officers having sexual contact with inmates consisted of a four-week program given in 1996 when he was first certified as a jail officer. (*Id*. at 11:17-14:2, 81:21-25; *Id*. at 11:17-14:2, 81:21-25.)  This was the only training Defendant Christensen had outside the jail. (*Id*. at 82:1-6.)

107.    Christensen cannot remember the content of the 1996 training, specifically. (*Id*. at 12:4-14; *Id*. at. 12:4:4-14.)

108.    Defendant Christensen does not recall Polk County offering or providing any in-house training to its correctional officers on the topic of sexual contact with inmates or PREA (*Id*. at 12:21-13:11; 20:19-25).

109.    Christensen did not know that an inmate was unable to consent to sexual acts. (*Id*. at 140:12-141:9,141:21-142:12; *Id*. at 140:12-141:9, 141:21-142:12.)

110.    Interrogatory Number 13 from Plaintiffs to Polk County specifically requested to describe in detail any and all training on the issue of fraternization with inmates, including sexual conduct. (Bannink Aff. Ex. A.)

111.    Request for Production of Documents Number 3 requests all documents generated as a result of training received by Defendant Christensen, including but not limited to PREA. (*Id*.)

112. No documents were provided from Polk County pursuant to discovery requests that any training from Polk County (other than January 2014) included PREA. (Bannink Aff. Exs. B, C.)

113. Captain Nargis indicated that 90 topics are covered in the daily training and that jailers use an honor system to indicate they have complied with the training by signing their name. The topical list has never been provided in discovery and neither has a list of Christensen's acknowledgments that he allegedly reviewed the policies. (Case No. 15-c-433, ECF No. 49 at 25:25-26:18; Case No. 15-c-428, ECF No. 48 at 25:25-26:18; Bannink Aff. Exs. A, B, C.)

114. The PREA policy in the jail handbook only targets what to do once a matter is reported. (Nargis Decl. Ex. B.)

115. The one alleged PREA training that was given to jail staff on February 20, 2014, was oral, no materials were presented, and PREA requirements were not specifically read to the attendees. (Case No. 15-c-433, ECF No. 49 at 41:11-42:22; Case No. 15-c-428, ECF No. 48 at 41:11-42:22.)

116. Captain Nargis does not know how long PREA was discussed, if it was more than 5 minutes, or if it consisted of only three bullet points (Nargis Decl. Ex. G.) that may have simply been read to staff attendees word-for-word. (Case No. 15-c-433, ECF No. 49 at 43:1-5; 47:20-48:3; Case No. 15-c-428, ECF No. 48 at 43:1-5; 47:20-48:3.)

117. Taser recertification was also addressed at the alleged PREA meeting. (Bannink Aff. Ex. C, PCJ 3778.)

118. The sign in sheet for the day did not mention PREA training, but only that the type of training was "Taser Re-Cert." (*Id*. 3818.)

119. The following day, Captain Nargis followed up the meeting with an email to all staff with the following content:

   o Seems to be that everyone is in a tizzy to train their staff on PREA. There is no requirement for us to be compliant with everything that the law calls for, but nevertheless it is federal law. So we'll hit the basics of PREA training.

   o Do not allow/condone inappropriate contact between inmates.

   o Do not allow/condone/engage in inappropriate contact between staff & inmates.

   o If someone (staff or inmate) presents a concern about inappropriate contact, report it to me.

   (Nargis Decl. Ex. G.)

120. Captain Nargis indicates that this brief summary of PREA was provided based on conversations with Brad Hompe. (Case No. 15-c-433, ECF No. 49 at 44:14-45:4; Case No. 15-c-428, ECF No. 48 at 44:14-45:4.)

121. Brad Hompe provided extensive materials available to Polk County Jail regarding PREA, including PowerPoint presentations (Case No. 15-c-433, ECF No. 73 at 13:7-14:4. 18:8-19; Case No. 15-c-428, ECF No. 72 at 13:7-14:4. 18:8-19.)

122. Captain Nargis does not recall being provided PREA material in writing from Hompe, does not recall taking notes from his conversation with Hompe, and does not have any documents that would show the basic requirements of PREA. (Case No. 15-c-433, ECF No. 49 at 44:20-45:15; Case No. 15-c-428, ECF No. 48 at 44:20-45:15.)

123. Many jail administrators were considering hiring PREA consultants. (*Id*. at 44:3-8, 45:16-25; *Id*. at 44:3-8, 45:16-25.)

124. If Captain Nargis had a question regarding PREA one resource he would use would be a

PREA consultant. (*Id*. at 90:20-91:9; *Id*. at 90:20-91:9.)

125.   Nargis has not consulted a PREA consultant and does not feel the need to now.  (*Id*. at 44:9-12, 91:6-9; *Id*. at 44:9-12, 91:6-9.)

126.   Hompe had numerous resources on jailer training and also was able to give presentations himself on the topic of inmate manipulation and professionalism that "focuses around avoiding any type of in appropriate or too close of conversations with inmates that would lead to relationships." (Case No. 15-c-433, ECF No. 73 at 27:22-28:12; Case No. 15-c-428, ECF No. 72 at 27:22-28:12.)

127.   Polk County never availed Mr. Hompe of his offers to provide training.  (*Id*. at 27:2-8; *Id*. at 27:2-8.)


**H.  Polk County's failure to train inmates on PREA**

128.   Inmate education is important as a lot of inmates do not know what sexual abuse is and they do not know what is prohibited by law. (Case No. 15-c-433, ECF No. 77 at 74:12-19, 78:19-79:1; Case No. 15-c-428, ECF No. 76 at 74:12-19, 78:19-79:1.)

129.   The only PREA information that was provided to inmates from Polk County was one sentence on page 10 of 12 in the inmate handbook written in font smaller than any other text on the same page. (Bannink Aff. Ex. K, p. 10.)

130.   The language provided to inmates in the Inmate Handbook is an abbreviated version of the complete PREA notice that would have been provided from Hompe to Polk County Jail and that someone from Polk County must have chosen to exclude certain information. (Case No. 15-c-433, ECF No. 73 at 23:11-26:12; Case No. 15-c-428, ECF No. 72 at 23:11-26:12.)

131.   Information regarding PREA reporting was never provided to inmates. (Case No. 15-c-433, ECF No. 52 at 19:20-20:10; Case No. 15-c-428, ECF No. 51 at 19:20-20:10; Case No. 15-c-433, ECF 46 at 85:17-86:1, Case No. 15-c-428, ECF No. 47 at 85:17-86:1.)

132.   Plaintiffs have not received PREA training from Polk County. (Decl. of MJJ July 27, 2016 ("MJJ Decl.") ¶4; Decl. of JKJ July 27, 2016 ("JKK Decl.") ¶4.)

133.   Plaintiffs came into the Polk County Jail with histories of violence and victimization in their lives. (*Id*. at ¶3; *Id*. at ¶3.)

134.   Plaintiffs were never trained by Polk County as to what sexual harassment and abuse consists of. (*Id*. at ¶5; *Id*. at ¶5.)

135.   Plaintiffs were never trained by Polk County that they have a zero tolerance policy towards inmate abuse and/or harassment. (*Id*. at ¶6; *Id*. at ¶6.)

136.   Plaintiffs were never trained by Polk County that there was a specific person at Polk County Jail that they could report assault/abuse to that would handle all of the allegations for the jail. (*Id*. at ¶7; *Id*. at ¶7.)

137.   Plaintiffs were never trained by Polk County that they had the ability to report the abuse and harassment in confidence. (*Id*. at ¶8; *Id*. at ¶8.)

138.   Plaintiffs were never trained by Polk County that if they reported abuse and/or harassment, they could not be retaliated against. (*Id*. at ¶9; *Id*. at ¶9.)

139.   Plaintiffs were never trained by Polk County that if they reported the abuse and harassment that they would not be judged. ( *Id*. at ¶10;  *Id*. at ¶10.)

140.   Had Plaintiffs been provided the training regarding reporting, they would have recognized Christensen's comments as harassment prior to abuse turning physical. (*Id*. at ¶11; *Id*. at ¶11.)

141.   Had Plaintiffs been provided the training and had a comfortable atmosphere of which to report the abuse and harassment, they would have been more likely to report the abuse and harassment prior to it turning physical. (*Id*. at ¶12; *Id.* at ¶12.)

142.   Captain Nargis is responsible for the Inmate Handbook and he has no knowledge whether or not PREA was consulted in making the grievance process within the handbook or whether it is PREA compliant. (Case No. 15-c-433, ECF No. 49 at 88:19-24, 102:22-25; Case No. 15-c-428, ECF No. 48 at 88:19-24, 102:22-25.)

143.   As to the grievance procedure, the only method available to report assault was handing a piece of paper to the jailer on duty.  (*Id*. at 102:22-103:7, 107:12-17; *Id*. at 102:22-103:7, 107:12-17; Bannink Aff. Ex. K.)

144.   The grievance process indicated in relevant parts:

>       Step One- Submit Initial Grievance
>
>       An officer will attempt to resolve the matter personally. If unable to do so, the form will be forwarded to a supervisor.
>
>       Step Two- Initial Grievance Response
>
>       A written response will be provided to the inmate within 5 days of the receipt of Grievance.
>
>       (Bannink Aff. Ex. K.)

145.   After the allegations regarding Christensen surfaced, Captain Nargis and Sheriff Johnson met with Kristi Dietz from the Head of the Office of Detention Facilities. Polk County was given copies of the posters to put up in the jail for inmates. (Case No. 15-c-433, ECF No. 53 at 27:10-14; Case No. 15-c-428, ECF No. 52 at 27:10-14.)

146.   Captain Nargis made the decision not to put the posters up because of his concern that inmates would attempt to tunnel out behind the poster or hide contraband behind a poster, as in the fictional movie, Shawshank Redemption. (Case No. 15-c-433, ECF No. 49 at 48:4-8; 107:21-109:1; Case No. 15-c-428, ECF No. 48 at 48:4-8; 107:21-109:1.)

147.   He has never heard of a similar real-life incident happening, nor did he ask Ms. Dietz how to address those concerns. (*Id*. at 108:5-109:1; *Id*. at 108:5-109:1.)

148.   When asked if the inmates were provided with copies of that information he indicated "No" because that information was provided in their handbook. (*Id*. at 49:9-14; *Id*. at 49:9-14.)

149.   Sheriff Johnson does not know if the posters are up but would be disappointed if they were not displayed as they are a cost effective means to educate and does not believe there would be a budgetary constraint in providing this information. (Case No. 15-c-433, ECF No. 53 at 28:19-23, 23:16-24:5, 28:8-11, 30:19-23; Case No. 15-c-428, ECF No. 52 at 28:19-23, 23:16-24:5, 28:8-11, 30:19-23.)

150.   Hompe has provided ways for Polk County to comply with the PREA recommendation that officer's announce their presence prior to entering a housing area, such as notifying inmates in the handbook or at the beginning of each shift that they will be supervised by both male and female inmates. (Case No. 15-c-433, ECF No. 73 at 59.20-60:6; Case No. 15-c-428, ECF No. 72 at 59.20-60:6.)

## I.  Polk County's culture

151.   It was normal procedure to have only one officer in the max pod, max control, which is where the sexual contact occurred. (Case No. 15-c-433, ECF No. 46 at 138:25-239:6,

102:12-24, 104:18-23; Case No. 15-c-428, ECF No. 47 at 138:25-239:6, 102:12-24, 104:18-23.)

152.    Christensen admitted that he would engage in the sexual contact when no other guards were present. (*Id*. at 58:15-22; *Id*. at 58:15-22.)

153.    A jailer in the maximum control area of the jail at Polk County can easily and clearly see into the shower and toilet areas of an inmate's cell. (Case No. 15-c-433, ECF No. 77 at 84:7-19; Case No. 15-c-428, ECF No. 76 at 84:7-19.)

154.    Christensen was closer to J.K.J. than any other inmates and would pay her more attention. (Case No. 15-c-433, ECF No. 51 at 21:23-7; Case No. 15-c-428, ECF No. 50 at 21:23-7.)

155.    There were three times when Jailer Pitman returned from lunch and Christensen was in the max pod where he requested the door to be opened and there was a delay for Christensen to open the door. (*Id*. at 31:2-10; *Id*. at 31:2-10.)

156.    Pittman engaged in sexual conversations about inmates (Case No. 15-c-433, ECF No. 46 at 133:7-134:3; Case No. 15-c-428, ECF No. 47 at 133:7-134:3.)

157.    It was common for jailers to participate in sexual conversations with inmates. (*Id*. at 133:4-11; *Id*. at 133:4-11.)

158.    Jailers including Scott Pittman, Tyler Briggs, Alan Jorgensen, and Michael Ottosen would participate in sexual conversations with inmates. (*Id*. at 134:7-135:17; *Id*. at 134:7-135:17.)

159.    Christensen indicated that he would talk about his lack of sex life at home with the inmates. (*Id*. at 134: 25-1; *Id*. at 134: 25-1.)

160.   Captian Nargis saw Christensen make sexual comments regarding females and that it was part of "typical tier" talk amongst the staff, which means banter.  (Case No. 15-c-433, ECF No. 49 at 83:6-84:8; Case No. 15-c-428, ECF No. 48 at 83:6-84:8.)

161.   Captain Nargis, in his supervisory capacity, has made comments about female coworkers' physical anatomy that have been derogatory and has heard other coworkers make comments about coworker's physical anatomy (*Id*. at 84:21-85:10; *Id*. at 84:21-85:10.)

162.   Nargis has "probably" heard comments from staff regarding inmates' rear ends or breasts as those kinds of comments are "part of the typical banter." (*Id*. at 85:15-24; *Id*. at 85:15-24.)

163.   Captain Nargis stated:

> Do I participate in and allow them to discuss amongst each other that here's a mug shot of an inmate who has two black eyes. Damn, that's messed up or that person fell off the tree or that person fell out of the ugly tree and hit every branch on the way down in that condition, yeah. Do I participate and allow the staff to make comments about each other? Yes. Again, generally speaking, that is more tier talk, dark humor, generally more insulting one another than anything else.

(*Id*. at 87:17-88:8; *Id*. at 87:17-88:8.)

164.   One time jailer Pittman entered into the K pod with female inmates, Christensen announced over the loud speaker that it was Pittman's birthday and the inmates should give him his birthday spankings. (Case No. 15-c-433, ECF No. 51 at 18:6-19:13; Case No. 15-c-428, ECF No. 50 at 18:6-19:13.)

165.   Jailer Pittman did not report the conduct because he "didn't think it was something that was illegal or something." (*Id*. at 18:6-19:13; *Id*. at 18:6-19:13.)

## J.   Assaults to Plaintiffs

166.   Christensen would call over the intercom and say that M.J.J. looked sexy, requesting that she leave the towel down so he can see in the shower, ask to put her lotion on topless, etc. (Case No. 15-c-433, ECF No. 48 at 64:20-65:2; Case No. 15-c-428, ECF No. 45 at 64:20-65:2.)

167.   Christensen would call M.J.J out of the cell and, while still standing in the bubble, stick his penis through a mail slot to have M.J.J. touch it. ( *Id*. at 90:17-23; *Id*. at 90:17-23.)

168.   Christensen would call M.J.J when she was legitimately doing research in the X room and direct her to touch herself. (*Id*. at 86:23-87:10; *Id*. at 86:23-87:10.)

169.   Christensen would call M.J.J. out of the pod, push her up against the glass and start touching or kissing her, which led to either oral or actual sex. (*Id*. at 90:22-21:3:10; *Id*. at 90:22-21:3.)

170.   Christensen would use his authority to call J.K.J. her over the intercom. (Case No. 15-c-433, ECF No. 47 at 57:21-22; Case No. 15-c-428, ECF No. 46 at 57:21-22.)

171.   Christensen called J.K.K out once to engage in sexual intercourse and twice to engage in oral sex. (*Id*. at 78:10-79:19; *Id*. at 78:10-79:19.)

172.   Christensen admitted that he engaged in sexual conduct with Plaintiff although he disputes the number of times and the type of conduct that he engaged in. (Case No. 15-c-433, ECF No. 46 at 32:20-24, 33:2-4, 33:8-10, 33:11-16, 37:23-38:2, 38:14-20, 33:17-

24:6; Case No. 15-c-428, ECF No. 47 at 32:20-24, 33:2-4, 33:8-10, 33:11-16, 37:23-38:2, 38:14-20, 33:17-24:6.)

173.   Christensen does not recall the topic of PREA being provided or offered at any of the in-house training done by Polk County.  (Case No. 15-c-433, ECF No. 46 at 20:19-25, Case No. 15-c-428, ECF No. 47 at 20:19-25.)

174.   Hompe stated that one of the issues jails were having with some of the PREA standards dealt with staffing; some jail administrators were simply not going to acknowledge the issues.  Nargis never discussed any difficulties he was having with PREA compliance.  However, in several of Hompe inspection reports noted that Polk County needed to increase supervision of their jail and that it was an ongoing issue.  (Case No. 15-c-433, ECF No. 73 at 43:20-45:15, Case No. 15-c-428, ECF No. 72 at 43:20-45:15.)

175.   PREA has not been a priority for Sheriff Johnson. (Case No. 15-c-433, ECF No. 53 at 22:1-9, Case No. 15-c-428, ECF No. 52 at 22:1-9.)

176.   Manning had a sexual relationship with Christensen from approximately August into September 2014.  Their relationship included inappropriate physical contact while they were working together at Polk County Jail. (Case No. 15-c-433, ECF No. 52 at  24:7-25:14, 26:24-28:17, Case No. 15-c-428, ECF No. 51 at  24:7-25:14, 26:24-28:17; Case No. 15-c-433, ECF No. 46 at  92:12-93:23, Case No. 15-c-428, ECF No. 47 at  92:12-93:23.)

177.   There are no cameras in the maximum/minimum pod area, which is where the bulk of assaults against Plaintiffs occurred. (Case No. 15-c-433, ECF No. 59 at 55:16-56:10; Case No. 15-c-428, ECF No. 58 at 55:16-56:10.)

178.   Captain Nargis did nothing to prepare for PREA implementation even though the subject

came up frequently with other jail administrators. (Case No. 15-c-433, ECF No. 49 at 37:25-38:9; Case No. 15-c-428, ECF No. 48 at 37:25-38:9.)

179.   While indicating that PREA is prohibitive financially, Nargis has never brought up his budgetary concerns to the Sheriff who is responsible for the budget. (*Id*. at 38:10-39:16; *Id*. at 38:10-39:16.)

180.   Nargis believes that the Sheriff has better things to do that sit down and cover each point of PREA. (*Id*. at 40:1-10; *Id*. at 40:1-10.)

181.   Nargis has had zero training specific to PREA. (*Id*. at 36:25-37:1.)


**ECKBERG LAMMERS, P.C.**


Dated:   29th of July, 2016_____            By:   s/Lida M. Bannink_____
                                                      Thomas J. Weidner (1082013)
                                                      Lida M. Bannink (1088518)
                                                      Attorneys for Plaintiff
                                                      430 Second Street
                                                      (715) 386-3733
                                                      tweidner@eckberglammers.com
                                                      lbannink@eckberglammers.com